**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL SHANNAHAN, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | **DEMAND FOR JURY TRIAL** |
| FTAI AVIATION LTD., JOSEPH P. ADAMS, JR., and EUN (ANGELA) NAM, | |
| Defendants. | |

Plaintiff Michael Shannahan ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by FTAI Aviation Ltd. ("FTAI" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by FTAI; and (c) review of other publicly available information concerning FTAI.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired FTAI securities between July 23, 2024 and January 15, 2025, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      FTAI owns and acquires aviation and offshore energy equipment. It operates through two segments, Aviation Leasing and Aerospace Products. The Aviation Leasing segment owns and manages aviation assets, including aircraft and aircraft engines, which it leases and sells to customers. The Aerospace Products segment allegedly develops, manufactures, repairs, and sells aircraft engines and aftermarket components for aircraft engines.

3.      On January 15, 2025, at approximately 1:00 p.m. EST, Muddy Waters Research published a report alleging, among other things, that "FTAI materially manipulates its financials" by "exaggerating the size of its aftermarket aerospace business", "misleading investors by presenting whole engine sales as individual module sales", "inflating Aerospace Products' EBITDA margins by means of over-depreciation in the leasing segment", and "engaging in channel stuffing" (the "Muddy Water Report").

4.      Specifically, the Muddy Waters Report alleges that the Company is "exaggerating the size of its aftermarket aerospace business" by "reporting one-time engine sales as Maintenance Repair & Overhaul (MRO) revenue in its Aerospace Products (AP) segment" when, in fact, the Company "performs limited repair and maintenance work on the engine assets sold."  The Muddy Waters Report further alleges the Company is also "[m]isleading investors by presenting whole engine sales as individual module sales" by "deceptively count[ing] each whole engine sale as a sale of three separate modules" in order to report substantially higher module sale numbers than would otherwise be reported and create "Module Factory numbers [which] are much higher than what real [customer demand for the Factory] is."

5.      The Muddy Waters Report further alleges the Company's "EBITDA margins are a direct result of its misleading accounting" wherein the Company "depreciates engines in its Leasing segment, even when engines are not on lease (merely when they are ready for use)." The Company "[t]hen it transfers the depreciated engines to AP Inventory." These "high depreciation rates in the Leasing segment help AP report lower COGS. Because AP realizes lower COGS, it reports a materially higher gross margin than it would otherwise."

6.      On this news, FTAI's stock price fell $37.21, or 24.3%, to close at $116.08 per share on January 15, 2025, on unusually heavy trading volume.

7.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) the Company reported one-time engine sales as Maintenance Repair & Overhaul revenue when FTAI only performs limited repair and maintenance work on the engine assets sold; (2) FTAI presents whole engine sales as individual module sales, thereby overstating sales and demand; (3) the Company

depreciates engines that are not on lease, which misleadingly lowers the reported cost of goods sold and inflates EBITDA; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

12.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

13.     Plaintiff Michael Shannahan, as set forth in the accompanying certification, incorporated by reference herein, purchased FTAI securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14.     Defendant FTAI is incorporated under the laws of the Cayman Islands with its principal executive offices located in New York City, New York. FTAI's ordinary shares trade on the NASDAQ exchange under the symbol "FTAI."

15.     Defendant Joseph P. Adams, Jr. ("Adams") was the Company's Chief Executive Officer ("CEO") at all relevant times.

16.     Defendant Eun (Angela) Nam ("Nam") was the Company's Chief Financial Officer ("CFO") at all relevant times.

17.     Defendants Adams and Nam (together, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

18.     FTAI owns and acquires aviation and offshore energy equipment. It operates through two segments, Aviation Leasing and Aerospace Products. The Aviation Leasing segment owns and manages aviation assets, including aircraft and aircraft engines, which it leases and sells to customers. The Aerospace Products segment allegedly develops, manufactures, repairs, and sells aircraft engines and aftermarket components for aircraft engines.

### Materially False and Misleading

### Statements Issued During the Class Period

19.     The Class Period begins on July 23, 2024. On that day, the Company announced its second quarter 2024 financial results in a press release for the period ended June 30, 2024. The press release reported the Company's financial results and touted the Company's business highlights, including that Aerospace Products reached a "***new Adjusted EBITDA high of $91.2mm for Q2***."[1] The press release stated that the Company "utilizes Adjusted EBITDA as our key performance measure" as it "provides the CODM [Chief Operating Decision Maker] with the information necessary to assess operational performance, as well as make resource and allocation decisions." The press release also purported to report the Company's relevant key finanical metrics including: adjusted EBITDA, aerospace products revenue, maintenance revenue, asset sales revenue, lease income cost of sales, the value of leasing and inventory assets, depreciation and amortization expenses. Specifically, the press release stated, in relevant part:

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added, and all footnotes are omitted.

| Selected Financial Results | | Q2'24 |
|---|---|---|
| Net Loss Attributable to Shareholders | $ | (228,205) |
| Basic Loss per Ordinary Share | $ | (2.26) |
| Diluted Loss per Ordinary Share | $ | (2.26) |
| Adjusted EBITDA[1] | $ | 213,904 |

\*          \*          \*

## Business Highlights

• *Aerospace Products reaches new Adjusted EBITDA high of $91.2mm for Q2.*

• FTAI has inducted 20 V2500 engines year to date and expects to induct an additional 30 by year end.

• FTAI's Module Factory™ now has over 50 active customers worldwide.

\*          \*          \*

| | Three Months Ended June 30, | |
|---|---|---|
| | 2024 | 2023 |
| **Revenues** | | |
| Lease income | $ 70,754 | $ 59,541 |
| Maintenance revenue | 51,187 | 42,065 |
| Asset sales revenue | 72,433 | 76,836 |
| Aerospace products revenue | 245,200 | 92,725 |
| Other revenue | 4,020 | 3,178 |
| Total revenues | 443,594 | 274,345 |
| | | |
| **Expenses** | | |
| Cost of sales | 205,857 | 104,532 |
| Operating expenses | 29,099 | 24,797 |
| General and administrative | 2,969 | 3,188 |
| Acquisition and transaction expenses | 8,019 | 2,672 |
| Management fees and incentive allocation to affiliate | 3,554 | 5,563 |
| Internalization fee to affiliate | 300,000 | — |
| Depreciation and amortization | 56,691 | 38,514 |
| Asset impairment | — | — |
| Interest expense | 55,196 | 38,499 |
| Total expenses | 661,385 | 217,765 |

\*          \*          \*

6

| Assets | |
|---|---:|
| Cash and cash equivalents | $ 169,485 |
| Restricted cash | 150 |
| Accounts receivable, net | 154,051 |
| Leasing equipment, net | 2,202,866 |
| Property, plant, and equipment, net | 33,078 |
| Investments | 19,886 |
| Intangible assets, net | 42,138 |
| Goodwill | 4,630 |
| Inventory, net | 373,282 |
| Other assets | 449,686 |
| Total assets | $ 3,449,252 |

\*                    \*                    \*

**Key Performance Measures**

The Chief Operating Decision Maker ("CODM") utilizes ***Adjusted EBITDA as our key performance measure.***

***Adjusted EBITDA provides the CODM with the information necessary to assess operational performance, as well as make resource and allocation decisions.*** Adjusted EBITDA is defined as net income (loss) attributable to shareholders from continuing operations, adjusted (a) to exclude the impact of provision for income taxes, equity-based compensation expense, acquisition and transaction expenses, losses on the modification or extinguishment of debt and capital lease obligations, changes in fair value of non-hedge derivative instruments, asset impairment charges, incentive allocations, depreciation and amortization expense, dividends on preferred shares, and interest expense, internalization fee to affiliate, (b) to include the impact of our pro-rata share of Adjusted EBITDA from unconsolidated entities, and (c) to exclude the impact of equity in earnings (losses) of unconsolidated entities and the non-controlling share of Adjusted EBITDA.

20.    On August 9, 2024, the Company provided an earnings supplement in conjunction with the Company's second quarter 2024 financial report. The earnings supplement reported the Company's purported Aviation Leasing and Aerospace Products segment EBITDAs and further reported additional key metrics for the Company's Aerospace Products segment, including that the Company "sold 82 CFM56 modules." Specifically, the earnings supplement stated, in relevant part:

## Financial Results Overview

### Business Segment Highlights

**1) Aviation Leasing:**

- $125.0 million Q2 2024 Adj. EBITDA[2] comprised of:
  - $111.5 million Leasing Adj. EBITDA
  - $13.5 million Gains on Sales

**2) Aerospace Products:**

- 163% Quarterly Adj. EBITDA growth versus Q2 2023[2]
- Sold 82 CFM56 modules in Q2 2024

| $s in millions | Q2 2024 |
|---|---|
| Net Income Attributable to Shareholders | $(228.2) |
| Internalization Fee to Affiliate | $300.0 |
| Net Income Excluding Internalization Fee | $71.8 |
| Adj. EBITDA[2] | |
| Aviation Leasing | $125.0 |
| Aerospace Products | $91.2 |
| Corporate & Other | $(2.3) |
| FTAI Consolidated | $213.9 |

\*             \*             \*

## Consolidated Key Financial Metrics

($s in millions)

| Quarter Over Quarter Results | Q2'23 | Q1'24 | Q2'24 |
|---|---|---|---|
| Aviation Leasing | $121.2 | $104.8 | $125.0 |
| Aerospace Products | $34.7 | $70.3 | $91.2 |
| Corporate & Other | $(2.8) | $(11.0) | $(2.3) |
| Adjusted EBITDA[1] | $153.1 | $164.1 | $213.9 |
| Depreciation & Amortization | $(48.9) | $(59.1) | $(65.8) |
| Interest Expense | $(38.5) | $(47.7) | $(55.2) |
| Other[3] | $(19.3) | $(26.0) | $(321.1)[4] |
| Net Income (Loss) Attributable to Shareholders | $46.4 | $31.3 | $(228.2) |

| Balance Sheet & Liquidity | Jun 30, 2024 |
|---|---|
| Cash | $169.6 |
| Net Leasing Equipment | $2,202.9 |
| Other Assets | $1,076.8 |
| Total Assets | $3,449.3 |
| Total Debt[2] | $3,077.6 |
| Total Equity | $69.6 |
| Total Debt + Total Equity | $3,147.2 |

\*             \*             \*

## Aerospace Products

### Highlights & Key Metrics

- Q2'24 Total Revenue growth of 164.5% versus Q2 2023
- 82 modules sold in Q2 2024
- Consistently generating Adj. EBITDA margins of between 30% - 40%
- 06/30 Engine parts inventory of $373.3mm to support backlog

| Aerospace Products Margin ($s in millions) | Q2'23 | Q1'24 | Q2'24 |
|---|---|---|---|
| Total Revenue | $92.7 | $189.1 | $245.2 |
| Adj. EBITDA[1] | $34.7 | $70.3 | $91.2 |
| Adj. EBITDA Margin %[2] | 37% | 37% | 37% |

### Aerospace Products Performance

($s in millions)

| Statement of Operations | Q2'23 | Q3'23 | Q4'23 | Q1'24 | Q2'24 |
|---|---|---|---|---|---|
| Total Revenue | $92.7 | $118.7 | $158.5 | $189.1 | $245.2 |
| Total Expenses | $(58.5) | $(76.4) | $(110.3) | $(119.6) | $(154.8) |
| Other[3] | $(0.9) | $(1.0) | $32.4 | $(3.1) | $(5.5) |
| Net Income Attributable to Shareholders | $33.3 | $41.3 | $80.6 | $66.4 | $84.9 |
| Adjusted EBITDA[1] | $34.7 | $43.3 | $54.6 | $70.3 | $91.2 |

Adj. EBITDA[1]



+160%

| | | | | |
|---|---|---|---|---|
| $35 | $43 | $55 | $70 | $91 |
| Q2'23 | Q3'23 | Q4'23 | Q1'24 | Q2'24 |

21.    On August 9, 2024, the Company submitted its quarterly report for the period ended June 30, 2024 on a Form 10-Q filed with the SEC, affirming the previously reported financial results (the "2Q24 10-Q"). The 2Q24 10-Q further set out the manner in which the Company allegedly disaggregates revenues, stating in relevant part:

*Asset sales revenue*—Asset sales revenue primarily consists of the transaction price related to the sale of aircraft and aircraft engines from our Aviation Leasing segment. From time to time, the Company may also assign the related lease agreements to the customer as part of the sale of these assets. We routinely sell leasing equipment to customers and such transactions are considered recurring and ordinary in nature to our business. As such, these sales are accounted for within the scope of ASC 606. Revenue is recognized when a performance obligation is satisfied by transferring control over an asset to a customer. Revenue is recorded with corresponding costs of sales, presented on a gross basis.

*            *            *

*Aerospace products revenue*—Aerospace products revenue primarily consists of the transaction price related to the sale of ***repaired*** CFM56-7B, CFM56-5B and V2500 engines, engine modules, spare parts and used material inventory, and are accounted for within the scope of ASC 606. Revenue is recognized when a performance obligation is satisfied by transferring control over the related asset to a customer. Revenue is recorded with corresponding costs of sales, presented on a gross basis. Aerospace products revenue also consists of engine management service contracts, where the Company has a stand-ready obligation to provide replacement CFM56-7B and CFM56-5B engines to customers as they become unserviceable during the contract term. The Company recognizes revenue over time using a straight-line attribution method and the costs related to fulfilling the performance obligation are expensed as incurred.

22.    The 2Q24 10-Q further described the purported nature of the Company's revenue, stating in relevant part:

**Revenues**

Comparison of the three months ended June 30, 2024 and 2023

• Total revenue increased $17.1 million driven by an increase in Lease income and Maintenance revenue, partially offset by a decrease in Asset sales revenue.

• Lease income increased $12.6 million primarily due to an increase in the number of aircraft and engines placed on lease during the year, partially offset by an increase in the number of aircraft and engines redelivered.

• Maintenance revenue increased $9.1 million primarily due to an increase in the number of aircraft and engines placed on lease and higher aircraft and engine utilization.

• Asset sales revenue decreased $4.4 million primarily due to a decrease in the sale of commercial aircraft and engines.

23.     On October 30, 2024, the Company issued a press release announcing its third quarter 2024 financial results in a press release for the period ended September 30, 2024. The press release reported the Company's financial results and touted the Company's business highlights, including earnings of "over $100 million Adjusted EBITDA in Aerospace Products." The press release maintained that the Company "utilizes Adjusted EBITDA as our key performance measure" as it "provides the CODM [Chief Operating Decision Maker] with the information necessary to assess operational performance, as well as make resource and allocation decisions." The press release also purported to report the Company's relevant key finanical metrics including: adjusted EBITDA, aerospace products revenue, maintenance revenue, asset sales revenue, lease income cost of sales, the value of leasing and inventory assets, depreciation and amortization expenses. Specifically, the press release stated, in relevant part:

| Selected Financial Results | | Q3'24 |
|---|---|---|
| Net Income Attributable to Shareholders | $ | 78,147 |
| Basic Earnings per Ordinary Share | $ | 0.76 |
| Diluted Earnings per Ordinary Share | $ | 0.76 |
| Adjusted EBITDA[1] | $ | 232,030 |

\*               \*               \*

**Business Highlights**

   • ***FTAI reports over $100 million Adjusted EBITDA in Aerospace Products.***

\*               \*               \*

10

|  | Three Months Ended September 30, | |
|  | 2024 | 2023 |
| **Revenues** | | |
| Lease income | $ 65,450 | $ 45,622 |
| Maintenance revenue | 59,917 | 63,925 |
| Asset sales revenue | 34,953 | 61,400 |
| Aerospace products revenue | 303,469 | 118,675 |
| Other revenue | 2,005 | 1,474 |
| Total revenues | 465,794 | 291,096 |
| | | |
| **Expenses** | | |
| Cost of sales | 219,496 | 116,707 |
| Operating expenses | 26,858 | 33,887 |
| General and administrative | 4,045 | 3,015 |
| Acquisition and transaction expenses | 9,341 | 4,261 |
| Management fees and incentive allocation to affiliate | — | 4,577 |
| Internalization fee to affiliate | — | — |
| Depreciation and amortization | 56,775 | 43,959 |
| Asset impairment | — | — |
| Interest expense | 57,937 | 40,185 |
| Total expenses | 374,452 | 246,591 |

\*          \*          \*

|  | September 30, 2024 | December 31, 2023 |
| **Assets** | | |
| Cash and cash equivalents | $ 111,888 | $ 90,756 |
| Restricted cash | 150 | 150 |
| Accounts receivable, net | 166,338 | 115,156 |
| Leasing equipment, net | 2,066,337 | 2,032,413 |
| Property, plant, and equipment, net | 103,605 | 45,175 |
| Investments | 19,448 | 22,722 |
| Intangible assets, net | 38,001 | 50,590 |
| Assets held for sale | 119,012 | — |
| Goodwill | 31,533 | 4,630 |
| Inventory, net | 490,997 | 316,637 |
| Other assets | 591,601 | 286,456 |
| Total assets | $ 3,738,910 | $ 2,964,685 |

\*          \*          \*

## Key Performance Measures

*The Chief Operating Decision Maker ("CODM") utilizes Adjusted EBITDA as our key performance measure.*

*Adjusted EBITDA provides the CODM with the information necessary to assess operational performance, as well as make resource and allocation decisions.* Adjusted EBITDA is defined as net income (loss) attributable to shareholders from continuing operations, adjusted (a) to exclude the impact of provision for income taxes, equity-based compensation expense, acquisition and transaction expenses, losses on the modification or extinguishment of debt and capital lease obligations, changes in fair value of non-hedge derivative instruments, asset impairment

charges, incentive allocations, depreciation and amortization expense, dividends on preferred shares, and interest expense, internalization fee to affiliate, (b) to include the impact of our pro-rata share of Adjusted EBITDA from unconsolidated entities, and (c) to exclude the impact of equity in earnings (losses) of unconsolidated entities and the non-controlling share of Adjusted EBITDA.

24.    On October 30, 2024, the Company provided an earnings supplement in conjunction with the Company's third quarter 2024 financial report. The earnings supplement reported the Company's purported Aviation Leasing and Aerospace Products segment EBITDA results, as well as key metrics for the Company's Aerospace Products segment, including that the Company's "Annual Shop Visit Capacity for 1,350 CFM56 Modules". Specifically, the earnings supplement stated, in relevant part:

### Financial Results Overview

**Business Segment Highlights**

1) Aviation Leasing:
- $136.4 million Q3 2024 Adj. EBITDA[1] comprised of:
  - $122.2 million Leasing Adj. EBITDA
  - $14.2 million Gains on Sales

2) Aerospace Products:
- Generated Revenue of $303.5 million
- 135% Quarterly Adj. EBITDA growth versus Q3 2023[1]

| $s in millions | Q3 2024 |
|---|---|
| Net Income Attributable to Shareholders | $78.1 |
| Adj. EBITDA[1] | |
| Aviation Leasing | $136.4 |
| Aerospace Products | $101.8 |
| Corporate & Other | $(6.2) |
| FTAI Consolidated | $232.0 |

\*        \*        \*

### Consolidated Key Financial Metrics

($s in millions)

| Quarter Over Quarter Results | Q3'23 | Q2'24 | Q3'24 |
|---|---|---|---|
| Aviation Leasing | $116.9 | $125.0 | $136.4 |
| Aerospace Products | $43.3 | $91.2 | $101.8 |
| Corporate & Other | $(6.0) | $(2.3) | $(6.2) |
| Adjusted EBITDA[1] | $154.2 | $213.9 | $232.0 |
| Depreciation & Amortization | $(59.4) | $(65.8) | $(69.5) |
| Interest Expense | $(40.2) | $(55.2) | $(57.9) |
| Other[3] | $(21.6) | $(321.1)[4] | $(26.5) |
| Net Income (Loss) Attributable to Shareholders | $33.0 | $(228.2) | $78.1 |

| Balance Sheet & Liquidity | Sep 30, 2024 |
|---|---|
| Cash | $112.0 |
| Net Leasing Equipment | $2,066.3 |
| Other Assets | $1,560.6 |
| Total Assets | $3,738.9 |
| Total Debt[2] | $3,218.3 |
| Total Equity | $118.5 |
| Total Debt + Total Equity | $3,336.8 |

\*        \*        \*

12



25.     On November 12, 2024, the Company submitted its quarterly report for the period ended September 30, 2024 on a Form 10-Q filed with the SEC, affirming the previously reported financial results (the "3Q24 10-Q"). The 3Q24 10-Q set out the manner in which the Company purportedly disaggregates revenues, stating in relevant part:

> *Asset sales revenue*—Asset sales revenue primarily consists of the transaction price related to the sale of aircraft and aircraft engines from our Aviation Leasing segment. From time to time, the Company may also assign the related lease agreements to the customer as part of the sale of these assets. We routinely sell leasing equipment to customers and such transactions are considered recurring and ordinary in nature to our business. As such, these sales are accounted for within the scope of ASC 606. Revenue is recognized when a performance obligation is satisfied by transferring control over an asset to a customer. Revenue is recorded with corresponding costs of sales, presented on a gross basis.

*          *          *

> *Aerospace products revenue*—Aerospace products revenue primarily consists of the transaction price related to the sale of CFM56-7B, CFM56-5B and V2500 engines, engine modules, spare parts and used material inventory, and are accounted for within the scope of ASC 606. Revenue is recognized when a performance obligation is satisfied by transferring control over the related asset to a customer. Revenue is recorded with corresponding costs of sales, presented on a gross basis. Aerospace products revenue also consists of engine management service contracts,

where the Company has a stand-ready obligation to provide replacement CFM56-7B and CFM56-5B engines to customers as they become unserviceable during the contract term. The Company recognizes revenue over time using a straight-line attribution method and the costs related to fulfilling the performance obligation are expensed as incurred.

26.    The 3Q24 10-Q further described the purported nature of the Company's revenue,

stating in relevant part:

**Revenues**

Comparison of the three months ended September 30, 2024 and 2023

Total revenues increased by $174.7 million, driven by the following:

• Aerospace products revenue increased by $184.8 million, primarily due to a $164.3 million increase in CFM56-7B, CFM56-5B and V2500 engine and module sales, a $9.6 million increase in parts inventory sales, and other sales revenue of $7.7 million from the QuickTurn and LMCES acquisitions.

• Lease income increased by $19.8 million, primarily due to increases in aircraft lease revenue of $10.0 million, engine lease revenue of $7.2 million, and a decrease in lease incentive amortization of $4.1 million. Aircraft and engine revenue both increased due to an increased number of assets on lease in Q3 2024 compared to Q3 2023. This was partially offset by a decrease of $1.5 million in the Offshore Energy business driven by one of our vessels in the Offshore Energy business having fewer days on-hire in 2024 compared to 2023.

• Asset sales revenue decreased by $26.4 million, primarily due to an overall decrease in the number of sales transactions of commercial aircraft and engines. Specifically, one aircraft was sold in Q3 2024 as compared to one aircraft and eight engines sold in Q3 2023.

• Maintenance revenue decreased by $4.0 million. Aircraft maintenance revenue decreased by $14.8 million from Q3 2023 to Q3 2024, due to $18.2 million of higher maintenance reserves taken into revenue in Q3 2023, partially offset by an increased number of aircraft on lease in Q3 2024 generating maintenance revenue as compared to Q3 2023. This decrease in aircraft maintenance revenue was partially offset by increased engine maintenance revenue of $10.8 million, driven by an increased number of engines on lease in Q3 2024 generating maintenance revenue as compared to Q3 2023.

27.    The 3Q24 10-Q reported, for the first time, the following disclosure:

***Cash Flow Presentation***—Included in net cash (used in) provided by operating activities are inflows from the sale of engine modules and parts that were on engines originally purchased and reported as Leasing equipment, net on the Consolidated

Balance Sheet. The purchase of the original engine was reported as an outflow in net cash used in investing activities at the time of purchase through the Acquisition of leasing equipment line item. As part of the Aerospace products business, the Company breaks down generally unserviceable engines with the intent to manufacture modules and parts for creation and sale of new assets. To manufacture the modules and parts and bring them into a salable condition, the Company spends significant costs, often over multiple reporting periods, for new inventory and capitalizable labor (e.g., engineering) that are included in net cash (used in) provided by operating activities as components of the changes in the related working capital accounts.

*Therefore, when the costs to manufacture the assets are greater than (predominant to) the estimated value transferred from Leasing equipment into inventory, the related cash receipt has been recorded as an inflow in net cash (used in) provided by operating activities.*

28.     The above statements identified in ¶¶ 19-27 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) the Company reported one-time engine sales as Maintenance Repair & Overhaul revenue when FTAI only performs limited repair and maintenance work on the engine assets sold; (2) FTAI presents whole engine sales as individual module sales, thereby overstating sales and demand; (3) the Company depreciates engines that are not on lease, which misleadingly lowers the reported cost of goods sold and inflates EBITDA; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**<u>Disclosures at the End of the Class Period</u>**

29.     On January 15, 2025, at approximately 1:00 p.m. EST, investor research group Muddy Waters Research published a report alleging, among other things, that "FTAI materially manipulates its financials" by "exaggerating the size of its aftermarket aerospace business", "misleading investors by presenting whole engine sales as individual module sales", "inflating

Aerospace Products' EBITDA margins by means of over-depreciation in the leasing segment", and "engaging in channel stuffing." Specifically, the Muddy Waters Report states, in relevant part:



# How FTAI Materially Manipulates Its Financials

We believe:
- FTAI is exaggerating the size of its aftermarket aerospace business
- Misleading investors by presenting whole engine sales as individual module sales
- Inflating Aerospace Products' EBITDA margins by means of over-depreciation in the leasing segment
- Engaging in channel stuffing
- Facing fundamental headwinds

MUDDY WATERS RESEARCH                                                              4

30.    The Muddy Waters Report alleges that the Company is "exaggerating the size of its aftermarket aerospace business" by "reporting one-time engine sales as Maintenance Repair & Overhaul (MRO) revenue in its Aerospace Products (AP) segment" when, in fact, the Company "performs limited repair and maintenance work on the engine assets sold."  The Muddy Waters Report quotes a consultant and former executive who stated "FTAI apparently did not perform significant repairs or upgrades of these engines." The Muddy Waters Report explains that, by reporting sales in this manner, the Company can "dress-up" its leasing business to portray an attractive aerospace segment business, essentially "bolting on limited maintenance and repair capabilities" to the Company's leasing segment, and reporting it as a separate Aerospace Products segment, as part of a "Financial Engineering Scheme." Specifically, the Muddy Waters Report states, in relevant part:

## FTAI Materially Manipulates Its Financials



Muddy Waters is short FTAI Aviation Ltd. (FTAI US) because its financial reporting is highly misleading. We believe revenue from true maintenance and individual off-the-rack module sales are materially lower than reported. FTAI, in our view, is misleading investors by reporting one-time engine sales as Maintenance Repair & Overhaul (MRO) revenue in its Aerospace Products (AP) segment.  It appears that FTAI's AP revenue growth story is due to trading whole engines (i.e., asset sales). We estimate ~80% of FTAI's Aerospace Products adjusted EBITDA is gains on sale, which we believe is largely from selling whole engines. The goal of these misrepresentations appears to be to generate a valuation materially greater than that of a leasing business. Fortress sold significant stock in a May 2024 secondary offering on the back of FTAI's misleading narrative.

FTAI claims that the average Aerospace Products transaction is two modules.[1]  We disagree. We think ~70% to 80% of module sales are whole engine sales. To exaggerate the size of its MRO business, reportedly FTAI deceptively counts each whole engine sale as a sale of three separate modules.  As of Q3 2024, FTAI no longer discloses how many modules it sells per quarter.  We believe this omission helps FTAI preserve its aerospace aftermarket story.  Ultimately, in our view, Aerospace Products is simply a dressed-up leasing business.  Substantially all leasing companies trade assets; and, given its inherent cyclicality, engine trading income is highly volatile. We see nothing durable or proprietary about trading engines.

Evidence suggests that FTAI stuffed the channel through questionable aircraft sales in 2023.

Our analysis finds that FTAI's current EBITDA margin run-rate is not sustainable. FTAI's outlier EBITDA margins appear to be due to an accounting game FTAI plays whereby it depreciates engines in its Leasing segment, even when engines are not on lease (merely when they are ready for use). Then it transfers the depreciated engines to AP Inventory. FTAI's AP Inventory has been largely comprised of depreciated Leasing Equipment, which results in considerable margin outperformance compared to peers. FTAI generates EBITDA margins that are ~10 percentage points higher than peers, including Boeing (~18% EBIT margin)[2] and GE Commercial Engines and Services (~27% EBITDA margin), each of which have considerably greater scale. This mirage benefits selling insiders.

[1] FTAI Aviation Q1 2024 Earnings Call April 26, 2024. Per FTAI's CEO: "So, but on average, the average transaction averages out to two modules per transaction." [2] FTAI's Aerospace Products reports minimal D&A allowing for this comparison.

\*                    \*                    \*

## Approximately One-Third of Aerospace Product's YTD 2024 Revenue Appears to Really Be Whole Engine Sales – Not Module Swaps



MW engaged an industry expert with 20+ years of experience, who is also a former FTAI executive, to canvass the major aerospace asset traders to determine the magnitude of FTAI's whole engine sales. **The research findings are below:**

- FTAI has likely sold ~70 whole engines through the first nine months of 2024, which are counted as three modules per engine, and likely account for ~80% of reported module sales (i.e. ~210 reported module sales are actually ~70 whole engines):

    "FTAI is roughly selling 22 CFM[-56] engines (i.e., Narrowbody) engines) a quarter. They've sold 82 to date [2024], and they still have some closing before the end of the year... I called all the major [traders], all the big guys... I'm averaging about that 22 a quarter."[1]

- FTAI is currently actively marketing 10-12  whole engines:

    "It looks like they're gonna sell around 90 for the year [2024], maybe a couple more than that...They're marketing a whole bunch right now to try to get some year-end sales in…I know right now they are trying to sell 10 or 12 engines…they could get [to]100 engines this year." [1]

- FTAI apparently did not perform significant repairs or upgrades of these engines:

    "They've not really had a lot of touch work done by FTAI..."[1]

- Whole engine sales are getting done as exchanges or swaps**:**

    "They're doing a lot of the deals as exchanges, which makes sense. They're selling a good engine and taking in an unserviceable engine…They're selling three modules and taking in three modules." [1]

    "I've got the 10-Q right now…they've got one narrowbody [engine] sale all year… and actually the [true] number is closer to the purchase numbers…they could be recording the [engine] exchanges as purchases (ie. Engine being received in the exchange is disclosed as a purchase)." [1]

[1] Consultant A.

\*                    \*                    \*

## Our Consultant, A Former FTAI Executive, Relays How the MRO Was Born of a Financial Engineering Scheme



Our consultant explained that FTAI was a traditional leasing platform that was valued on a P/B basis. Management saw an opportunity by changing the narrative to aerospace. Management perceived that if FTAI were considered to be an MRO, it would trade on a multiple of EBITDA.

To do so FTAI first undertook seemingly cosmetic changes by bolting on limited maintenance and repair capabilities and picking up spare parts and feedstock on the market. It entered into a basic MRO contract with Lockheed and marketed it as the Module Factory.

FTAI then entered a consignment agreement with AAR and called it the USM business (used serviceable material - 2nd hand parts).

Last, it bought LLP (life limited parts – spare parts) on the market for feedstock.[1]

[1] Consultant A.

\*            \*            \*

## FTAI in Q3 2024 Introduced a New Cash Flow Disclosure That Implies Aerospace Products Generally Adds Little Value to Assets Sold



In FTAI's Q3 2024 10-Q, management introduced this disclosure for the first time (see Appendix for full excerpt):

"When the costs to manufacture the assets are greater than (predominant to) the estimated value transferred from Leasing equipment into inventory, the related cash receipt has been recorded as an inflow in net cash (used in) provided by operating activities."[1]

An investor spoke with FTAI. FTAI confirmed that the new language indicates that the test to report Aerospace Products income on the Operating or Investing side of the Cash Flow Statement is determined by the amount of capitalized costs to the assets while held in Inventory.

[1] FTAI Q3-2024 10-Q pg 13.

\*            \*            \*



## Aerospace Products Is a Dressed-Up Leasing Business

- As we show, the primary function of Aerospace Products appears to be to sell or exchange whole engines (not individual modules).
- Substantially all leasing companies sell, trade, and exchange, engines / aircraft.
- We believe as little as 20% of Aerospace Products volume is true module-swapping work.
- Despite FTAI's 2026 guidance for improved FCF, which investors require in an aerospace aftermarket business, FTAI's financial profile looks like that of other leasing businesses.
- We believe FTAI's profile will continue to mirror that of a leasing business.
- Generally, leasing companies **trade on a P/BV and/or a P/E basis,**[1] and have the following features:
  - Highly capital intensive
  - Cyclical
  - Volatile earnings
  - Low growth
  - Subpar ROIC

[1] Per JPM's coverage of Aercap, May 8, 2024: "Accordingly, our YE24 equity price target is lifted to $105, predicated on a blend of 1.1x BV and 10x forward P/E."

MUDDY WATERS RESEARCH                                                                                    27

31.     To prop up this scheme, the Company allegedly is "[m]isleading investors by presenting whole engine sales as individual module sales" by "deceptively count[ing] each whole engine sale as a sale of three separate modules." As a result, FTAI reported substantially higher module sale numbers than would otherwise be reported and created "Module Factory numbers [which] are much higher than what real [customer demand for the Factory] is." Specifically, the Muddy Waters Report states, in relevant part:



# A Substantial Portion of Aerospace Products' Revenue Is Whole Engine Sales

We Believe FTAI Is Selling Whole Engines and Telling Investors it Sold Three Modules.  This Helps FTAI Sell Investors on an Aerospace Aftermarket Story.

\*                    \*                    \*

## Evidence Whole Engine Sales Are Material



CFM56 engines are commonly thought of as containing three modules: the Fan, the Core, and the Low-Pressure Turbine (LPT).  FTAI also reports CFM56 engines as being in three modules.[1]

FTAI's GAAP financials indicate that whole engine sales are a material contributor to FTAI's AP segment:
- FTAI's revenue and EBITDA per employee are significant outliers vs peers (~3x and ~7x, higher, respectively).
- FTAI generates about ~$2m in GAAP revenue per module sold, compared to the sticker price a customer would pay for an off-the-rack module (~$700k - ~$1.5m).

We spoke with a former senior FTAI executive who believes that ~80% of the reported module swaps are actually whole engine sales.

We engaged another former FTAI executive to canvass the major aftermarket traders in the industry.
- His research determined that approximately 1/3 of FTAI's YTD 2024 Aerospace Products revenue consisted of misreported whole engine sales largely executed via engine exchanges.
- Another industry expert echoed a similar sentiment.

New language in the Q3 2024 10-Q explicitly states that whole engines are now a component of Inventory, highlighting the materiality of whole engines to Aerospace Products.[3]

[1] FTAI Aviation Investor's Day Presentation June 7, 2023., Q1 2024 Earnings Call April 26, 2024, CEO: "Three modules is a whole engine." Et ala.  [3] FTAI Aviation 10-Q Q3 2024, Pg. 12

\*                    \*                    \*

## Counting Whole Engine Sales as Modules Sales Was FTAI's Modus Operandi, According to a Former Senior Employee



A former FTAI executive explained that while he worked for the company it sold whole engines but reported such transactions as the sale of three modules:

> "And here's the other thing you have to be very cautious about… when they sell an engine, they're not selling an engine. They're selling [three] modules. So the, The Module Factory numbers are much higher than what real [customer demand for the Factory] is." [1]

Later in the same discussion:

> MW: "How do we know that is still happening at the moment?"

> Consultant: "Well, I'm no longer there. But I could tell you **that was the line of thought when I was there…**so what I'm suggesting is that that is still happening…there would be more of those modules [that] would be attributed to engine sales than to true module swaps." [1]

[1] Consultant A.
Note: FTAI and most industry experts consider a CFM56 engine to be a three-module engine (Fan, Core, LPT). Consultant A counts the HPT as an additional module, bringing his total to four; we standardized the figure above.

\*     \*     \*

## The Misrepresentation of Engine Sales Is Material



Another former FTAI executive echoed the same sentiment:

> Source C: "I think they sell between 60 and 80 engines a year and they report 95% into the Aerospace business." [1]

Later in the same conversation, MW asked Source C about the YTD 2024 reported module sales

> MW: "What portion of the business that they're doing do you think would be real individual module sales and whole engine exchanges counted as three modules?…"

> Source C: "…I think it's 80/20, right. So, I think they do 80 [whole] engine sales a year that they count as modules." [1]

[1] Source C, former Senior FTAI executive.

\*     \*     \*

**After FTAI Stopped Disclosing Module Sales, Management Still Pushes the Module Narrative**



Q2 2024[1]

- Q2'24 Total Revenue growth of 164.5% versus Q2 2023
- 82 modules sold in Q2 2024
- Consistently generating Adj. EBITDA margins of between 30% - 40%
- 06/30 Engine parts inventory of $373.3mm to support backlog

Q3 2024[2]

- Q3'24 Total Revenue growth of 155.7% versus Q3 2023
- Annual Shop Visit Capacity for 1,350 CFM56 Modules
- Consistently generating Adj. EBITDA margins of between 30% - 40%
- 09/30 Engine parts inventory of $491.0mm to support backlog

[1] FTAI Aviation Earnings Supplement Q2 2024, Pg. 9.  [2] FTAI Aviation Earnings Supplement Q3 2024, Pg. 9.

MUDDY WATERS RESEARCH                                                                 20

32.     The Muddy Waters Report further alleges the Company's "EBITDA margins are a direct result of its misleading accounting" wherein the Company "depreciates engines in its Leasing segment, even when engines are not on lease (merely when they are ready for use)." Allegedly, the Company "[t]hen it transfers the depreciated engines to AP [Aerospace Products] Inventory." These "high depreciation rates in the Leasing segment help AP report lower COGS. Because AP realizes lower COGS, it reports a materially higher gross margin than it would otherwise." Specifically, the Muddy Waters Report states, in relevant part:

## FTAI is Deliberately Inflating the Profitability of Aerospace Products



FTAI depreciates engines in Leasing to boost Aerospace Products' margin. High depreciation rates in the Leasing segment help AP report lower COGS. Because AP realizes lower COGS, it reports a materially higher gross margin than it would otherwise. We believe this explains the significant difference in EBITDA margin between FTAI and its peers.  A major FTAI MRO competitor remarked about FTAI's margin profile:

*"Something to think about when you're studying them is, kind of, why are their margins so high, and my theory is that their [Aerospace Products] asset base is at [the] depreciated book value and that's the cost that gets baked into their margins."[1]*

| Adj. EBITDA Margins – FTAI vs Peers | |
|---|---|
| Heico | ~26% |
| SARO Engine Services | ~13% |
| Lufthansa Technik[1] | 18% |
| MTU Aero[2] | 17% |
| GE Commercial Engines & Services[3] | 27% |
| Boeing Global Services[4] | 18% |
| Average | ~20% |
| FTAI AP, Adj EBITDA, YTD-2024 | ~36% |
| FTAI AP, Adj. EBITDA margin commentary | 30% - 40% |
| Source: Company filings except as noted | |

[1] MRO Competitor.

Notes to table: [1] Excludes intercompany revenue. [2] 2024E EBITDA margin per S&PCapIQ. [3] 2023 GE CES figures =(5600 CES op profit + ~800 D&A) / 23,900 = 27% EBITDA margin. [4] EBIT margin ~ FTAI's Aerospace Products reports minimal D&A allowing for this comparison. Per sell side re Boeing Global Services: "The engineering modification and maintenance business acts as an internal MRO shop servicing Boeing and other aircraft needs. We estimate that this represents about 37.5% of total BGS revenue."

\*          \*          \*

# FTAI Depreciates Engines in Leasing to Exaggerate the Profits in Its MRO Business

## FTAI's Leasing Segment Assumes a Material Portion of Aerospace Products' COGS, Which Explains the ~1,000bps Discrepancy in EBITDA Margins Vs Peers

\*          \*          \*



## FTAI's Accounting Is Organized to Misleadingly Boost Aerospace Products' Margins

AP acquires a used engine, capitalizing the full cost to Leasing Equipment even if FTAI purchases an unserviceable engine always intended for the MRO[1]

Engines are depreciated when ready for lease, even if not on lease, which is recorded in Leasing Equipment

Engines are moved via noncash balance sheet transfers to Inventory. FTAI has wide latitude to estimate residual values, giving it the benefit of potentially moving equipment to Inventory with artificially low carrying values

AP sells, or exchanges, whole engine/ splits into modules in Inventory, realizing the COGS of equipment that was depreciated in Leasing prior to being transferred to AP Inventory

Analysts value FTAI using a ~20x multiple for FTAI's Aerospace Products business

[1] Per FTAI IR and accounting, all intact engines (serviceable or unserviceable) are recorded in Leasing Equipment, at inception, in line with the guidance it has received from their Auditor.

MUDDY WATERS RESEARCH                                                                 29

\*                    \*                    \*

## FTAI's EBITDA Margins Are a Direct Result of Its Misleading Accounting



- FTAI's AP EBITDA margins (~30% - 40%) are not representative of economic reality because ~70% of AP's COGS originated in the Leasing segment and, we believe, benefit from depreciation while held in Leasing.
- Aerospace Products incurs COGS from the engines it sells on the basis of Inventory carrying values. Because its Inventory has largely come from depreciated Leasing Equipment, FTAI incurs materially lower Aerospace COGS than do its MRO peers.
- FTAI also has considerable subjectivity to calculate engine residual values, which can cause material differences in the values of assets FTAI transfers from Leasing to Inventory.
- This has the consequence of inflating FTAI's EBITDA margins, which are **~ten percentage points higher than peers.**
- FTAI has also moved Inventory back to Leasing, which could be an effort to again benefit from Leasing depreciation.

Note: See Appendix where FTAI notes ~80% of shop visit costs are materials, which suggests that there is opportunity for meaningful depreciation while held in Leasing Equipment.

MUDDY WATERS RESEARCH                                                                 30

\*                    \*                    \*

24



**FTAI's Misleading Accounting Results in a ~1,000bps Margin Difference Between FTAI and Peers**

FTAI's Aerospace Products EBITDA margins are inflated because hundreds of millions of cash costs are incurred by the Leasing segment rather than in Aerospace Products.

| Adj.EBITDA Margins – FTAI vs Peers | |
|---|---|
| Heico | ~26% |
| SARO Engine Services | ~13% |
| Lufthansa Technik[1] | 18% |
| MTU Aero[2] | 17% |
| GE Commercial Engines & Services[3] | 27% |
| Boeing Global Services[4] | 18% |
| **Average** | **~20%** |
| **FTAI AP, Adj. EBITDA margin, YTD-2024** | **~36%** |
| **FTAI AP, Adj. EBITDA margin commentary** | **30% - 40%** |
| Source: Company filings except as noted | |

Notes to table:  [1] Excludes intercompany revenue.  [2] 2024E EBITDA margin per S&PCapIQ.  [3] 2023 GE CES figures = (5600 CES op profit + ~800 D&A) / 23,900 = ~27% EBITDA margin.  [4] EBIT margin – FTAI's Aerospace Products reports minimal D&A allowing for this comparison. Per sell side re Boeing Global Services: "The engineering modification and maintenance business acts as an internal MRO shop servicing Boeing and other aircraft needs. We estimate that this represents about 37.5% of total BGS revenue."

MUDDY WATERS RESEARCH                                                                                              34

33.     On this news, FTAI's stock price fell $37.21, or 24.3%, to close at $116.08 per share on January 15, 2025, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

34.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired FTAI securities between July 23, 2024 and January 15, 2025, inclusive , and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

35.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, FTAI's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or

thousands of members in the proposed Class. Millions of FTAI shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by FTAI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

36.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

37.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

38.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    (a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

    (b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of FTAI; and

    (c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

39.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

40.     The market for FTAI's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, FTAI's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired FTAI's securities relying upon the integrity of the market price of the Company's securities and market information relating to FTAI, and have been damaged thereby.

41.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of FTAI's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about FTAI's business, operations, and prospects as alleged herein.

42.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about FTAI's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class

purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

43.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

44.    During the Class Period, Plaintiff and the Class purchased FTAI's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

45.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding FTAI, their control over, and/or receipt and/or modification of FTAI's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning FTAI, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

## (FRAUD-ON-THE-MARKET DOCTRINE)

46.     The market for FTAI's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, FTAI's securities traded at artificially inflated prices during the Class Period.   On November 21, 2024, the Company's share price closed at a Class Period high of $174.96 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of FTAI's securities and market information relating to FTAI, and have been damaged thereby.

47.     During the Class Period, the artificial inflation of FTAI's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about FTAI's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of FTAI and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

48.     At all relevant times, the market for FTAI's securities was an efficient market for the following reasons, among others:

(a)     FTAI shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, FTAI filed periodic public reports with the SEC and/or the NASDAQ;

(c)    FTAI regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    FTAI was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

49.    As a result of the foregoing, the market for FTAI's securities promptly digested current information regarding FTAI from all publicly available sources and reflected such information in FTAI's share price. Under these circumstances, all purchasers of FTAI's securities during the Class Period suffered similar injury through their purchase of FTAI's securities at artificially inflated prices and a presumption of reliance applies.

50.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the

importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

51.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of FTAI who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and

### Rule 10b-5 Promulgated Thereunder

### Against All Defendants

52.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

53.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase FTAI's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

54.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for FTAI's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

55.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about FTAI's financial well-being and prospects, as specified herein.

56.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of FTAI's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about FTAI and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly

herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

57.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

58.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing FTAI's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain

such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

59.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of FTAI's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired FTAI's securities during the Class Period at artificially high prices and were damaged thereby.

60.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that FTAI was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their FTAI securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

61.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

62.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act

### Against the Individual Defendants

63.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

64.     Individual Defendants acted as controlling persons of FTAI within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

65.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

66.     As set forth above, FTAI and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members

of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 17, 2025

*/s/ Rebecca Dawson*
**GLANCY PRONGAY & MURRAY LLP**
Rebecca Dawson
230 Park Ave, Suite 358
New York, New York 10169
Telephone: (213) 521-8007
Facsimile: (212) 884-0988
Email: rdawson@glancylaw.com

Robert V. Prongay
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
2121 Avenue of the Stars, Suite 800

Century City, CA 90067
Telephone: (310) 914-5007

*Counsel for Plaintiff Michael Shannahan*

# SWORN CERTIFICATION OF PLAINTIFF

## FTAI AVIATION LTD. SECURITIES LITIGATION

I, Michael Shannahan, certify that:

1. I have reviewed the Complaint, adopt its allegations, and authorize the filing of a Lead Plaintiff motion on my behalf.

2. I did not purchase the FTAI Aviation Ltd. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in FTAI Aviation Ltd. securities during the Class Period set forth in the Complaint are as follows:

   (See attached transactions)

5. I have not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years, except for the following:

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

1/17/2025
_____
Date

_____
Michael Shannahan

**Michael Shannahan's Transactions in FTAI Aviation Ltd.
(FTAI)**

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 11/15/2024 | Bought | 4 | $159.0000 |
| 11/22/2024 | Bought | 5 | $176.6500 |
| 12/12/2024 | Sold | -6 | $134.8100 |