**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CITY OF HOLLYWOOD FIREFIGHTERS' PENSION FUND and BOSTON RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>FTAI AVIATION LTD., JOSEPH P. ADAMS, JR., and EUN (ANGELA) NAM,<br><br>Defendants. | Case No. 1:25-cv-00541-JAV<br><br>Hon. Jeannette A. Vargas<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS


I. OVERVIEW ....... 2

II. JURISDICTION AND VENUE ....... 14

III. PARTIES ....... 15

A. Lead Plaintiffs ....... 15

B. Defendants ....... 15

IV. SUBSTANTIVE ALLEGATIONS ....... 17

A. Background ....... 17

1. FTAI Evolves From A General Transportation Business Into An Aviation Focused Business ....... 17

2. FTAI's Corporate Structure ....... 18

a. Aviation Leasing ....... 18

b. Aerospace Products ....... 19

3. Aerospace Products Becomes The Focus Of FTAI's Growth Narrative And Analysts Embrace FTAI's Claims Of Rapid Growth ....... 21

4. By Using Adjusted EBITDA As A Key Performance Measure, And Urging A Focus On Aerospace Products, FTAI Increases Its Overall Valuation ....... 25

B. During The Class Period, Defendants Misrepresented Aerospace Products' Financials To Create A Façade Of Fast-Paced Growth ....... 28

1. Defendants Misleadingly Depreciated Assets That Aerospace Products Acquired From Aviation Leasing, Artificially Reducing Aerospace Products' Costs Of Goods Sold And Increasing Its EBITDA ....... 28

2. Defendants Utilized Improper Accounting Determinations To Inflate Aerospace Products' EBITDA ....... 33

a. Defendants Were Able To Manipulate Values For Aerospace Products Acquired Engines, As Well As The Values For Individual Engines/Modules That Are Retained In Aerospace Products' Inventory, Transferred To Aviation Leasing Or Sold To Customers ....... 33

b. FTAI Utilized Deceptive Accounting Practices To Inflate Aerospace Products' EBITDA ....... 35

3. Defendants Knowingly Issued Falsely Inflated Revenue And EBITDA Results To Investors As A Result Of The Fraudulent Accounting Scheme ....38

C. Defendants' Scheme To Inflate EBITDA And Mislead Investors Is Revealed....40

D. After The End Of The Class Period, A Second Analyst Reported Issues With FTAI's Financial Reporting, While FTAI Rapidly Concluded Its Self-Serving Investigation And Claimed No Wrongdoing....41

V. DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD AND ANALYSTS ACCEPTED THOSE STATEMENTS....42

A. Second Quarter 2024 Financial Results....42

B. Jefferies Global Industrial Conference....48

C. Third Quarter 2024 Financial Results....50

VI. LOSS CAUSATION....58

VII. ADDITIONAL ALLEGATIONS OF SCIENTER....60

A. Defendants Adams And Nam Were Financially Motivated To Commit Securities Fraud And Manipulate Accounting Figures....60

B. Under Applicable Accounting Rules, The Segment Information That FTAI Reported For Aerospace Products, Including EBITDA, Was Reviewed And Relied Upon By Defendant Adams....62

C. The Aerospace Products Financial Information That Is Alleged To Be False Was Regularly Discussed With Investors By The Individual Defendants....63

D. Aerospace Products' EBITDA Was An Essential Component Of FTAI's Financial Reporting And A Primary Driver Of Its Share Price Increases And Thus Was Critical To FTAI's Core Operations....63

VIII. LEAD PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE....65

IX. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE....66

X. CLASS ACTION ALLEGATIONS....67

XI. CAUSES OF ACTION....69

XII. PRAYER FOR RELIEF....75

XIII. JURY TRIAL DEMANDED....75

Court-appointed Lead Plaintiffs, City of Hollywood Firefighters' Pension Fund and Boston Retirement System (collectively, "Lead Plaintiffs"), by and through their undersigned counsel, bring this action individually and on behalf of all other similarly situated persons and entities who purchased or otherwise acquired FTAI Aviation Ltd. ("FTAI" or the "Company") common stock between July 23, 2024 and January 21, 2025, inclusive (the "Class Period"), and were injured thereby (the "Class"). Lead Plaintiffs assert claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), against Defendants FTAI, Joseph P. Adams, Jr. ("Adams"), and Eun (Angela) Nam ("Nam") (collectively, "Defendants"). Adams and Nam are collectively referred to as the "Individual Defendants."

As set forth herein, Lead Plaintiffs and Class members purchased FTAI common stock at artificially inflated prices created and/or maintained by Defendants' materially false or misleading statements and omissions throughout the Class Period. When the truth concerning FTAI was belatedly revealed to the market, Lead Plaintiffs and Class members suffered monetary damages. Except as to the allegations specifically pertaining to Lead Plaintiffs, all allegations herein are based upon the investigation undertaken by Lead Plaintiffs' counsel, which included, but was not limited to, the review and analysis of: (i) public filings made by FTAI with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases and other public statements issued by the Defendants; (iii) research reports issued by securities and financial analysts; (iv) media and news reports related to FTAI; (v) transcripts of FTAI's earnings and other investor conference calls; (vi) publicly available presentations, press releases, and interviews by FTAI and its employees; (vii) economic analyses of the movement and pricing of FTAI publicly traded common stock; and (viii) consultations with relevant consultants and experts. Lead Plaintiffs believe that substantial

additional evidentiary support will exist for the allegations set forth herein after Lead Plaintiffs have had a reasonable opportunity for discovery.

## I. OVERVIEW

1. FTAI is an aviation leasing and maintenance company with two business segments: Aviation Leasing and Aerospace Products. The Company's Aviation Leasing segment focuses on the leasing and sales of aircraft and jet engines to its airline customers. The Aerospace Products segment focuses on the exchange and/or repair of its airline customers' jet engines. During the Class Period, the Aerospace Products segment was FTAI's most important division to analysts and investors, given that it received a higher valuation multiple[1] based on its purported recurring revenue structure. Further, the Company emphasized that its Adjusted Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") was its key performance measure.[2] Thus, the market viewed EBITDA as the key metric to gauge the financial performance of the Aerospace Products division.

2. During the Class Period, Defendants' business strategy relied in large part on the transfer of engine inventory between FTAI's Aviation Leasing and Aerospace Products segments.

---

[1] Valuation multiples are a metric used by many market participants to assess how a company's stock price relates to key financial metrics. In the case of FTAI, analysts look at the ratio between FTAI's share price and EBITDA.

[2] As used in this Complaint, the term "Adjusted EBITDA" as referenced by Defendants is referred to simply as "EBITDA." According to FTAI's Form 10-K for 2024, filed March 3, 2025, "Adjusted EBITDA is defined as net income (loss) attributable to shareholders from continuing operations, adjusted (a) to exclude the impact of provision for (benefit from) income taxes, equity-based compensation expense, acquisition and transaction expenses, losses on the modification or extinguishment of debt and preferred shares and capital lease obligations, changes in fair value of non-hedge derivative instruments, asset impairment charges, incentive allocations, depreciation and amortization expense, dividends on preferred shares and interest expense, internalization fee to affiliate, (b) to include the impact of our pro-rata share of Adjusted EBITDA from unconsolidated entities and (c) to exclude the impact of equity in earnings (losses) of unconsolidated entities and the non-controlling share of Adjusted EBITDA, if any."

As alleged herein, Defendants knowingly employed deceptive accounting practices in order to report a fraudulently inflated Aerospace Products' EBITDA to the investing public.

3. First, Defendants reported the depreciation of the value of the engines it acquired under its Aviation Leasing division before transferring those engines to the Aerospace Products division to fuel FTAI's engine exchange program, thereby reducing Aerospace Products' cost basis. The fact that depreciation on engines was inccurred prior to the transfer had the effect of drastically improving Aerospace Products' EBITDA. The lowering of the cost basis in the engines through depreciation incurred prior to the transfer was accentuated by the fact that FTAI depreciated its engines at a far faster pace than its peers. For example, FTAI assigned a useful life of 2-6 years to aircraft engines, as compared to the useful life of 15-20 years employed by FTAI's peers.

4. Second, Aerospace Products would receive an engine that no longer was useful in exchange (plus cash from the customer) for a working engine that the customer could install on its aircraft. In connection with the exchange, Defendants purposely overstated the fair value of engines received by Aerospace Products. Even worse, the allocation of inflated fair value was manipulated, with lower values assigned to engine components (referred to as "modules") that could quickly be added to the Aerospace Products' inventory. Modules requiring more time-intensive or costly maintenance, but with inflated assigned values, often would be transferred to Aviation Leasing (generally after they were repaired), which would then depreciate those modules.

5. Defendants' cyclical scheme of transferring modules and engines between Aviation Leasing and Aerospace Products to incur depreciation costs in Aviation Leasing for the purpose of boosting margins in Aerospace Products, as well as the assignment of inflated fair values to swapped customer engines in the Aerospace Products division, allowed Defendants to report

artificially inflated EBITDA, EBITDA growth, EBITDA margins, and revenues throughout the Class Period. Defendants' statements during the Class Period related to these metrics were therefore knowingly false and misleading when made.

6. FTAI went public in 2015, as part of a larger entity focused on industrial infrastructure and equipment leasing, including aviation. In 2022, FTAI's non-aviation business segments were spun-off, leaving the Company primarily focused on commercial jet engine leasing and repair, and aircraft leasing. As part of this corporate restructuring, FTAI's Aerospace Products division was officially established. Where the Company's Aviation Leasing business focused on the lease and sale of aircraft and aircraft engines, Aerospace Products engaged in aircraft engine Maintenance, Repair and Exchange ("MRE") (also referred to by FTAI's competitors as maintenance, repair and overhaul ("MRO")). With this business shift, Aerospace Products quickly became FTAI's primary and expanding business focus.

7. Since the inception of Aerospace Products, the Company has sought to alter investor perception of its operations from being primarily focused on engine and aircraft leasing, to a company that primarily is in the MRE business.

8. As part of FTAI's business pivot, Defendants acquired aircraft engine repair facilities in Miami, Florida and Montréal, Québec, which focus on the modular repair and refurbishment of the CFM56 and V2500 model engines—two of the most widely used commercial jet engines. Defendants have touted that FTAI's modular engine-exchange model gives the Company a competitive advantage over its MRO peers. Specifically, instead of repairing a customer's engine, FTAI exchanges the non-working or outdated engine module for a functional engine module in its Aerospace Products inventory. Upwards of 80% of Aerospace Products' sales are derived through these transactions. As alleged herein, however, FTAI's purported competitive

advantage was reliant on an undisclosed revolving door accounting scheme of asset transfers between its two business segments.

9. Leading up to the Class Period, Defendants touted Aerospace Products as a rapidly growing, sustainable business that would drive the Company's future growth. As early as its Q2 2022 earnings call, Defendant Adams told investors Aerospace Products was "a huge growth opportunity for us." The reason for FTAI's purported business transformation is clear—a growing, MRE-focused business with a recurring revenue model affords a much greater market valuation than a business focused primarily on leasing aircraft. Indeed, since the inception of Aerospace Products, equity analysts have primarily focused on that segment and valued it significantly higher than Aviation Leasing.

10. In order to maintain the higher valuation multiple and analyst favor for Aerospace Products, Defendants had to report favorable and growing EBITDA, which they referred to as a key performance measure. For example, in the Company's recent 2024 annual report, filed with the SEC on Form 10-K, FTAI reiterated its now-longstanding position that EBITDA "provides the [Chief Operating Decision Maker] with the information necessary to assess operational performance and make resource and allocation decisions. We believe [] EBITDA is a useful metric for investors and analysts for similar purposes of assessing our operational performance."

11. Even prior to the Class Period, Defendants lauded FTAI's purportedly strong and growing Aerospace Products' EBITDA. In Q3 2022, specifically discussing Aerospace Products' EBITDA, Defendant Adams told investors, "We see tremendous potential and feel good about generating $20 million to $30 million in quarterly EBITDA and think $100 million plus in 2023 EBITDA to be very doable." Continuing in February 2023, FTAI touted exponential EBITDA growth, claiming that, by 2026, Aerospace Products' EBITDA would reach $500 million.

Defendant Adams explained at an industry conference in September 2023, that the "biggest driver" of its EBITDA projections is The Module Factory within the Aerospace Products segment, accounting for $400 million of EBITDA out of its $500 million goal for 2026.

12. Analysts following the Company fully embraced Defendants' claims regarding the purported growth in Aerospace Products' EBITDA. For example, immediately prior to the Class Period, on April 25, 2024, Compass Point analysts concluded that "we view the Aerospace Products segment as the most important driver of value for FTAI near-term . . . ." Similarly, that same day, equity analyst BTIG, addressing FTAI's reported growth in Aerospace Products' EBITDA, asserted that "demand for FTAI's aftermarket services is robust and should continue to provide a nice tailwind as management continues to build out the business." Furthermore, BTIG explained that FTAI "is currently trading at ~14x consensus' 2024 EBITDA estimate of ~$700M," which is a "slight premium" compared to competitors, but that "a greater premium is warranted owing to rising aftermarket demand and the cross-selling opportunities engine sales create for the aftermarket business."

13. At all relevant times, the Individual Defendants were strongly motivated to pump Aerospace Products' EBITDA growth based on the correlation between EBITDA, stock price, and their performance-based compensation. Specifically, FTAI's compensation policy incentivized the Individual Defendants with "performance-based restricted share units ('PSUs')" that are "determined based on the annualized total shareholder return ('Annualized TSR (CAGR)') of [FTAI's] Ordinary Shares."

14. PSUs formed the lion's share of the Individual Defendants' compensation during the Class Period. According to the Summary Compensation table for 2024 in FTAI's 2025 Proxy, Defendant Adams earned $26.7 million in total compensation, of which $18.8 million was from

PSUs tied to FTAI's stock price. Similarly, Defendant Nam earned $4.95 million in 2024, of which $2.9 million was from PSUs. Put differently, more than 70% of Defendant Adams's reported 2024 compensation, and nearly 60% of Defendant Tam's reported 2024 compensation, was based upon their receipt of PSUs that were linked directly to the Company's share price. This provided the Individual Defendants with an exceptionally strong personal motivation to inflate Aerospace Products' EBITDA by any means necessary.

15. As alleged herein, the purported growth of Aerospace Products' EBITDA was illusory and had the intended effect of artificially inflating FTAI's share price throughout the Class Period. FTAI had two sources for acquiring engines: (1) engines obtained from its own Aviation Leasing segment and (2) engines obtained from repair customers as part of an exchange. Depending on the source of the engine, FTAI used various accounting gimmicks to artificially inflate Aerospace Products' EBITDA.

16. ***Engines Transferred from Aviation Leasing.*** As part of its MRE business strategy, FTAI transferred unleased, working engines from the inventory of Aviation Leasing to Aerospace Products, permitting Aerospace Products to resell the transferred engines with little to no work. During the time engines were held in Aviation Leasing, the engines were depreciated ***before*** transfer to Aerospace Products (with the depreciation costs solely borne by Aviation Leasing). Furthermore, the useful life assigned to engines in FTAI's Aviation Leasing division was ***multiples*** less than the useful life utilized by its peers. Accordingly, the engine's cost basis at the time of transfer to Aerospace Products was artificially reduced because of the accelerated depreciation costs purposefully incurred at the Aviation Leasing level, allowing Aerospace Products to book materially lower costs of goods sold than its MRO peers.

17. Because FTAI deceptively and intentionally incurred depreciation costs at the Aviation Leasing level, it significantly and artificially lowered the cost basis of the engines that Aerospace Products sold to its MRE customers. Defendants' accounting scheme caused FTAI to issue inflated EBITDA results and forecasts which were materially false and misleading.

18. As a result of the deceptive manipulation of depreciation between Aviation Leasing and Aerospace Products, Aviation Leasing's depreciation as a percentage of revenue increased from 21.8% during the first 9 months of 2023, to 32% in the first 9 months of 2024, or by approximately 47%. Benefitting from the depreciation taken in Aviation Leasing, for Q4 2024, FTAI reported an EBITDA margin (EBITDA as a percentage of revenue) of 34% for Aerospace Products, while noting that its competitors generally have 15% margins.

19. ***Engines Exchanged with Repair Customers.*** Aerospace Products' EBITDA was further fraudulently inflated by FTAI's deceptive accounting whenever it exchanged a working engine for a customer's non-working engine (plus cash). These engine swaps generally did not include express agreements as to the fair value of the non-working engine. Because of this, Defendants booked revenue as cash plus their own internal engine valuation. As alleged herein, Defendants fraudulently booked the non-working exchanged engines above the fair value of what they obtained. By assigning an inflated fair value to the engine received from the customer, Defendants increased the amount of revenue booked as part of the transaction. As much as 80% of FTAI's Aerospace Products sales are exchange sales in which FTAI receives a customer's old, run-out engine as partial payment for a new one. As explained in more detail below (*see infra* Section IV.B.2.), many of these acquired engines were accounted for at inflated values.

20. Upon receipt of the no longer useful engine, FTAI disassembled it to recover useful modules.[3] Upon disassembly, each module was assigned a value based on the artificially inflated fair value assigned post-exchange. Upon information and belief, FTAI purposely under-allocated book value to the modules that could be quickly reassembled as part of its engine exchange program, while over-allocating book value to the less fungible modules that would be retained in inventory for repair or other purposes.

21. Defendants were incentivized to, and did, fraudulently allocate lower book values to the modules that could be quickly resold, thereby artificially deflating cost of goods sold in Aerospace Products and falsely inflating its EBITDA. This scheme allowed Aerospace Products to sell engines that had a disproportionate volume of lost-cost, high-margin parts, while the costly, low-margin modules accumulated, at least initially, in Aerospace Products' inventory. This practice artificially inflated Aerospace Products' EBITDA and EBITDA margins.

22. Further, with respect to the modules accumulating in inventory that were not reusable or required significant, costly repairs, FTAI mitigated the costs associated with writing-off the over-valued modules by transferring them back (at the inflated costs) to Aviation Leasing. This is because over-valued inventory would require a write-down if left in inventory, thus reducing Aerospace Product's EBITDA. On the other hand, transfer of the over-valued modules to Aviation Leasing would avoid such a write-down and Aviation Leasing's depreciation of the modules would not impact EBITDA. Thus, the overvalued inventory would not necessarily impact Aerospace Products' profitability because, as one analyst put it, FTAI can "wash out excess inventory costs by simply transferring overvalued inventories to [its] [Aviation] Leasing Business,

---

[3] The two types of jet engines that are serviced by Aerospace Products are comprised of three modules—a fan module, a core module, and a low-pressure turbine module.

where the engines are depreciated to their residual value." This revolving-door accounting allowed FTAI to effectively launder the overinflated fair value of exchanged engines in order to artificially inflate its reported EBITDA.

23. To illustrate this point, during the Class Period there was a significant discrepancy between the value assigned to modules in FTAI's leasing and product divisions. In Q1 2024, Aerospace Products' inventories had an average book value of $1.54 million per CFM56 module, while the CFM56 modules sold by Aerospace Products had an average book value of just $1.01 million. This indicates that the value of a module sitting in inventory and awaiting repairs could have been 50% higher than the value of the modules actually sold. This comparative valuation, however, does not comport with reality. This indicates that FTAI valued the engines in its inventory, which were likely awaiting or under repairs, or which had been repaired, at significantly higher values than the modules that the Company actually sold to customers (which either did not require or already had undergone repairs). The only reason that modules awaiting repair or sale were more valuable than already sold modules was because of the accounting manipulations noted above.

24. The accounting practices described above materially misled investors about the actual EBITDA being achieved by Aerospace Products, as well as its future growth potential. While these practices benefitted Aerospace Products at the expense of reduced EBITDA for Aviation Leasing—because of the different valuation multiples applied to the two business segments—overall corporate valuation was increased.

25. Based off Defendants' fraudulent depreciation and fair value accounting scheme, during the Class Period Defendants made or caused to be made materially false and misleading

statements regarding, related to, or derived from the Aerospace Products division's falsely inflated EBITDA and revenues.

26. The Class Period begins on July 23, 2024. On that day, Defendants issued materially false and misleading EBITDA results and guidance in connection with FTAI's release of Q2 2024 financial results. Specifically, the earnings release falsely touted all time high Aerospace Products' EBITDA of "***$91.2mm for Q2***."[4] During the accompanying Q2 2024 earnings call held on July 24, 2024, Defendant Adams reiterated inflated results for Aerospace Products, lauding "***another excellent quarter with $91.2 million of EBITDA and an overall EBITDA margin of 37%***." Defendant Adams further announced the Company was raising the 2026 EBITDA guidance for the Aerospace Products segment from $550 million to $700 million. These statements were false and misleading when made given the record results were the product of FTAI's undisclosed and deceptive depreciation and fair value accounting practices.

27. Based on the fraudulently inflated EBITDA results and guidance for Aerospace Products for FTAI's Q2 2024, analysts encouraged investors to pour their money into FTAI shares. Specifically, Deutsche Bank reported on July 24, 2024 that "The Aerospace Products business continues to exceed expectations," and reiterated its "buy" rating of FTAI stock. The next day, on July 25, 2024, Deutsche Bank similarly raised its price target for FTAI to $125 based on "positive momentum in the Aero Products business." On August 8, 2024, Barclays reiterated FTAI's guidance, stating the Company was "on a favorable path of growth over the next two years."

28. As the Class Period progressed, Defendants continued to issue misleading statements regarding reported EBITDA. On August 9, 2024, Defendants issued FTAI's Q2 2024

---

[4] Unless otherwise stated, all emphasis in bold and italics hereinafter is added, and all footnotes are omitted.

quarterly report and an earnings supplement to be read in conjunction with such report, which affirmed the previously released EBITDA and related guidance for the Aerospace Products segment. The earnings supplement falsely touted Aerospace Products' quarterly adjusted EBITDA of $91.2 million, an increase of 163% year-over-year. The financial report and supplement further falsely reported the Aerospace Products segment had generated revenue of $245 million, a purported 160% year-over-year increase. Again, such vaunted results were reliant on FTAI's accelerated depreciation schedule used in the Aviation Leasing Division and the overstated and manipulated fair value of engines in the Aerospace Products division, all of which was concealed from investors.

29. FTAI's public reporting of purportedly meteoric EBITDA results continued. On October 30, 2024, the Company issued a press release announcing its Q3 2024 financial results and related supplement which reported adjusted EBITDA of $102 million, a 135% year-over-year increase. Defendants further reported EBITDA margins of 34% and revenue of $300.5 million year-to-date for Aerospace Products. On the related October 31, 2024 earnings call, Defendant Adams touted "tremendous growth" from the Aerospace Products division, driving upward revisions of EBITDA 2024 guidance "to $360 million to $375 million, up from . . . previous estimate of $325 million to $350 million."

30. Each of these statements were false and misleading because Defendants knew the reported EBITDA figures were falsely inflated based on the Company's misleading accounting practices.

31. Aerospace Products' inflated results informed the analyst coverage in the days following the earnings announcement. For example, Compass Point reported on October 30, 2024 that FTAI announced EBITDA for Q3 2024 of $232 million, which was "driven by a significant

beat at the aerospace products segment." The analyst report concluded, "Insofar as we view the products segment as the most important driver of value and upside for FTAI, the beat should be very well-received." On October 31, 2024, Barclays stated it was "bullish on the business" in response to the financial results, concluding that "FTAI's Products business is worthy of a more elevated multiple given the higher profitability of the segment relative to competitors."

32. The truth about Defendants' scheme to inflate Aerospace Products financial performance in order to pump up the Company's market valuation was revealed on January 15, 2025, when Muddy Waters Research ("Muddy Waters"), a prominent investment research firm, published a report (the "Muddy Waters Report") alleging that FTAI was "materially manipulat[ing] its financials" to artificially inflate the results of the Aerospace Products segment. Muddy Waters provided several bases, including some of those addressed above, to conclude that Aerospace Products' actual financial performance was nothing like what the Company's financial disclosures purported to show.

33. In response to the allegations, the price of FTAI shares plummeted $37.21 per share, or approximately 24%, from a close of $153.29 per share on January 14, 2025, to close at $116.08 per share on January 15, 2025.

34. Just days later, on January 21, 2025, FTAI announced that "the Audit Committee of the Board of Directors of the Company determined to commence a review (which included the engagement of independent advisors) in response to the assertions alleged in the [Muddy Waters Report]." FTAI further announced that "the Company cannot rule out the possibility that the filing of Company's Annual Report . . . may be delayed."

35. In response to this news, the price of FTAI shares declined $28.59 per share, or approximately 25%, from a close of $112.38 per share on January 17, 2025, to close at $83.79 per share on January 21, 2025.

36. After the end of the Class Period, on January 29, 2025, an investment research company known as Snowcap Research ("Snowcap") issued a separate report on FTAI's deceptive and manipulative accounting practices (the "Snowcap Report"). Snowcap noted that "[w]e agree with many of the conclusions of the Muddy Waters [R]eport . . . and today we are sharing new findings from our own 3-month investigation into FTAI," asserting that FTAI used "inventory accounting games" to significantly inflate Aerospace Products' reported EBITDA.

37. As a result of Defendants' wrongful acts and omissions, and the significant decline in the market price of the Company's securities when the truth was revealed to the market, Lead Plaintiffs and other members of the Class have suffered significant monetary damages. This action seeks to recover those damages.

## II. JURISDICTION AND VENUE

38. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5). This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

39. Venue is proper in the Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) because FTAI conducts a substantial amount of business in this District and a significant portion of Defendants' actions, and the subsequent damages, took place within this District. Further, FTAI's common stock trades on the Nasdaq Global Select Market ("Nasdaq"), located within the District.

40. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

### A. Lead Plaintiffs

41. Lead Plaintiff City of Hollywood Firefighters' Pension Fund is a pension fund established for the benefit of current and retired firefighters of the City of Hollywood, Florida. As set forth in the certification attached herein, City of Hollywood Firefighters' Pension Fund purchased FTAI common stock on the Nasdaq exchange during the Class Period and has been damaged thereby.

42. Lead Plaintiff Boston Retirement System ("Boston"), headquartered in Boston, Massachusetts, is a governmental defined benefit plan, established under Chapter 32 of the Massachusetts General Law. As of December 31, 2024, Boston managed over $10 billion in total assets. Boston and its Board serve members, retirees, and qualified beneficiaries by administering retirement benefits to all employees of the City of Boston and its agencies, including the Boston Planning & Development Agency, the Boston Housing Authority, the Boston Public Health Commission, and the Boston Water and Sewer Commission. As set forth in the certification attached hereto, Boston purchased FTAI common stock during the Class Period and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.

### B. Defendants

43. Defendant FTAI is incorporated under the laws of the Cayman Islands with its principal executive offices located in New York City, New York. FTAI's ordinary shares trade on the Nasdaq under the symbol "FTAI."

44. Defendant Adams was the Chairman of the Company's Board of Directors and the Company's Chief Executive Officer ("CEO") at all relevant times. Adams participated directly and substantially in the fraud by making the materially false or misleading statements alleged herein, failing to disclose material facts to investors, participating in the conference and earnings calls described herein, and knowingly and/or recklessly disregarding known risks. Further, Adams reviewed, approved, and signed FTAI's false or misleading SEC filings, including its 10-Qs and 10-Ks, and certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") and Exchange Act Rule 13a-14(a). The SOX certification represented that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which statements were made, not misleading." As a signatory, Adams had the duty to monitor any conduct or information that threatened to undermine the veracity of these filings, including all material facts concerning FTAI's Aviation Leasing and Aerospace Products divisions.

45. Defendant Nam was the Company's Chief Financial Officer ("CFO") at all relevant times. Nam participated directly and substantially in the fraud by making the materially false or misleading statements alleged herein, failing to disclose material facts to investors, participating in the conference and earnings calls described herein, and knowingly and/or recklessly disregarding known risks. Furthermore, Nam reviewed, approved, and signed FTAI's false or misleading SEC filings, including its 10-Qs and 10-Ks, and certifications pursuant to SOX and Exchange Act Rule 13a-14(a). The SOX certification represented that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background

#### 1. FTAI Evolves From A General Transportation Business Into An Aviation Focused Business

46. FTAI was originally part of a larger company formed in 2014 as Fortress Transportation and Infrastructure Investors LLC, which focused on the acquisition, management, and disposition of transportation assets and related infrastructure. At the time of the Company's IPO in 2015, it operated a leasing segment which owned and leased to customers transportation equipment in multiple industries, including aviation.

47. Initially, FTAI's aircraft and engine maintenance for aircraft it was leasing to its customers was provided by third-party MRO companies. This changed to some extent in 2020, when the Company invested in its own engine maintenance and repair capabilities through several business partnerships, including the establishment of The Module Factory, a maintenance center purportedly focused on the repair of certain aircraft engines and modules. Although FTAI recognized the benefits of being affiliated with an MRO organization to reduce maintenance costs, Defendants indicated FTAI was not interested in entering the MRO business, with Defendant Adams stating that ". . . we've sort of hesitated about buying an MRO shop because we don't really want to be in that business."

48. As early as 2021, however, investors began to perceive the potential benefits of FTAI's move toward entering the MRO business as a core element of its business model. For example, on November 19, 2021, an investment manager named Philosophy Capital Management LLC ("Philosophy Capital") issued a report on FTAI and its recent partnerships. Philosophy Capital found these partnerships transformed FTAI into a "vertically-integrated engine business . . ." Philosophy Capital projected 200% or more upside for FTAI stock and concluded that, while

FTAI's shares were trading at only $21 per share, FTAI's aviation segment alone was worth roughly $65 a share.

49. In the following years, FTAI's aviation leasing and maintenance segment became its business focus. Ultimately in 2022, the Company spun-off all other business segments besides its aviation business, with the aviation division continuing on as a public company. As a final step to FTAI's structure during the Class Period, in May 2024, it became a fully internally managed company following a $150 million payment to terminate its legacy management agreement with FIG LLC, an affiliate of the investment management firm Fortress Investment Group, LLC.

### 2. FTAI's Corporate Structure

50. Throughout the Class Period, FTAI's business centered on the repair, sale, and lease of the CFM56 and V2500 aircraft engines. These engines are among the most widely used, workhorse engines in the world, powering the older generation of Boeing 737 and Airbus A320 planes. FTAI also acquired and leased entire jet aircraft. FTAI operated through its Aviation Leasing and Aerospace Products business segments.

#### a. Aviation Leasing

51. At all relevant times, FTAI's Aviation Leasing segment owned and acquired aircraft and aircraft engines for lease and resale to its customers. According to the Company, its aircraft leases provided low-risk, long-term cash flows. As of December 31, 2023, Aviation Leasing purportedly owned and managed 96 commercial aircraft and 267 engines. Of those, 76 of the commercial aircraft and 175 engines were leased to operators or third parties, with the remaining inventory undergoing repair or maintenance, being prepared to go on lease, or held in short-term storage. Additionally in 2023, the Aviation Leasing segment purchased 101 engines, sold 41 engines, and transferred 17 engines to Aerospace Products.

52. In 2024, the year FTAI became internally managed, 79 engines were transferred from Aviation Leasing to Aerospace Products, a year-over-year increase of approximately 364%. During that same period, Aviation Leasing purchased 138 engines and sold 14 engines. As of December 31, 2024, Aviation Leasing owned 109 aircraft and 312 engines.

53. As alleged herein, the purpose behind the exponential increase of intra-Company engine transfers is clear. Specifically, Defendants were using Aviation Leasing as a vehicle to over-depreciate aircraft engines prior to transfer to Aerospace Products. Compared to FTAI's competitors, who assigned a useful life of 15-20 years to aircraft engines, Defendants utilized a useful life of 2-6 years. After depreciating an engine's value, the engine was transferred to Aerospace Products for resale with an artificially low cost basis, thereby significantly improving Aerospace Products' EBITDA and margins. The sharp increase in engine transfers is consistent with FTAI's artificially inflated EBITDA growth throughout the Class Period and indicative of Defendants' manipulative accounting scheme.

**b. Aerospace Products**

54. According to FTAI, the Aerospace Products segment "repairs and sells, through exclusivity arrangements, aftermarket components for aircraft engines." It focuses on the replacement of damaged or worn modules, rather than the repair of the broken or worn parts.

55. At year-end 2022, FTAI's module repair system was facilitated through FTAI's self-proclaimed "dedicated commercial maintenance program," known as "The Module Factory." FTAI publicized that the 500,000 square foot Module Factory facility in Montreal, Canada had a capacity for "up to 300 shop visits per year."

56. Standard maintenance is a significant cost for airlines. The typical shop visit for an aircraft's required maintenance is usually 3 to 6 months long and can cost more than $5 million. Throughout the Class Period, Aerospace Products focused on the jet engine aftermarket, *i.e.*,

engines that were no longer being serviced by their original manufacturers (typically after 10 years of use) due to increasing maintenance costs, requiring the owner/operator to bear the costs of service. An engine's aftermarket life is typically around 25 years, though some extend up to 40 years. Aftermarket engines require maintenance on average once every five years.

57. Jet engines serviced by FTAI have a modular design that facilitates a purportedly unique approach to repairing the engines. FTAI touts that, because of the modular design of the CFM56 engines, its module repair system purportedly avoids the significant costs and delay of standard maintenance. According to the Company, it focuses on "building modules ahead of time" and exchanging them with the engines or engine modules brought to FTAI for repairs to cut-down on expensive, time-intensive repairs. The Company contends that this module swapping strategy allows one module to be replaced instead of overhauling the entire engine. Thus, the Company claims that its module repair capabilities and exchange-based business model gave it a major advantage over its competitors who serviced the same modular engines. Throughout the Class Period, FTAI reported sales of modules as the primary revenue driver of its Aerospace Products segment.

58. As alleged herein, FTAI's use of a module-exchange model as its chief revenue driver was reliant on, and fueled by, Defendants' accounting scheme. Specifically, Defendants caused the Company to assign an overly inflated fair value to the customer modules and engines received in Aerospace Products' engine exchange transactions. Such fair value would be manipulated insofar as workable modules eligible for quick resale in the segment would be assigned a much lower fair value. The remaining modules, in turn, received an inflated valuation and transferred to Aviation Leasing for depreciation, beginning the cycle anew.

### 3. Aerospace Products Becomes The Focus Of FTAI's Growth Narrative And Analysts Embrace FTAI's Claims Of Rapid Growth

59. Prior to the Class Period, The Module Factory seemingly facilitated fast growth for Aerospace Products, causing the segment to become the prime focus of investors and analysts. During the Q2 2022 earnings call on July 28, 2022, in response to an analyst question about customer interest in the maintenance business, Defendants Adams told investors that "we're seeing very broad-based growth in users" and the Company was "building backlog for 2023." During the Q3 2022 earnings call held on October 28, 2022, Defendant Adams continued to tout the immediate success of the MRE business in Aerospace Products, stating, "Aerospace [P]roducts had another solid quarter[.]" He added, "We see tremendous potential and feel good about generating $20 million to $30 million in quarterly EBITDA and think $100 million plus in 2023 EBITDA to be very doable."

60. Three years after FTAI established The Module Factory, to further bolster its modular MRE business, on January 4, 2023, the Company acquired a 50% interest (along with its partner Unical Aviation Inc. ("Unical")) in the assets of iAero Thrust, a full-service aviation engine MRE located in Miami, Florida. According to FTAI, the Miami location was "the only hospital maintenance testing facility in the Americas dedicated to the CFM56 engine." FTAI and Unical rebranded the location the "QuickTurn Engine Center."

61. During the Q4 2022 earnings call on February 24, 2023, Defendant Adams continued to tout the growth of Aerospace Products:

> Aerospace Products had another good quarter with $22 million of EBITDA. We started these activities a little over a year ago and in the last five quarters have booked approximately $91 million of EBITDA without any contribution from PMA. We see tremendous potential and continue to feel good about generating $20 million to $30 million in quarterly EBITDA and think $100 million plus in 2023 EBITDA remains very doable.

> We feel confident about this number because we're seeing a rapidly expanding backlog of Aerospace Products business with other leasing companies, MROs or maintenance and repair organizations, and airlines.

62. In the same call, Defendant Adams also touted much greater future growth, claiming that by 2026 Aerospace Products' EBITDA would reach $500 million.

63. During the April 27, 2023 earnings call for Q1 2023, Adams reiterated:

> Aerospace Products had another excellent quarter with $27 million of EBITDA. We started these activities at the end of 2020 and in the last six quarters have booked approximately $120 million of EBITDA without any contribution from PMA. We see tremendous potential and continue to feel good about generating $20 million to $30 million in quarterly EBITDA and think $100 million plus in 2023 EBITDA remains very doable.
>
> We feel confident about this number because we're seeing a rapidly expanding backlog of Aerospace Products business with other leasing companies, maintenance and repair organizations and airlines.

64. Defendant Adams also stressed the potential growth of Aerospace Products and The Module Factory:

> And then I think there's a lot of upside as I mentioned before on module factories. We have strong backlog of customers who some of whom are fully committed and some have just given us verbals that they are looking for programs of eight or more modules a year and the number of airlines entering that keeps growing.

65. During the call, Frank Galanti, a Stifel analyst, asked "[I]s there a lot more room to grow in those customers, the 29 customers that you current – that you've worked with in the past?" Defendant Adams assured investors that the segment was going to continue growing:

> Yes. There's a lot of room to grow, and as you've indicated. . . . Well, first of all, I would say there's no churn and that we've not lost any customers. Nobody that has used the product has said to us or indicated that they wouldn't use it again. So that's a very good thing and people like the product. And if you look at their total number of shop visits starting out. You're talking about airlines that have potentially anywhere from 10 to 100 shop visits a year.

66. During the Q2 2023 earnings call on July 27, 2023, Defendant Adams once again praised the performance of the Aerospace Products division:

> Aerospace Products had yet another excellent quarter with $30 million of EBITDA at an overall EBITDA margin of 44%. We sold 37 modules in Q2 to nine unique customers comprised of three new customers and six repeat customers. We see tremendous potential and continue to feel good about generating $20 million to $30 million in quarterly EBITDA and think $100 million plus in 2023 EBITDA remains very doable. We feel confident about this number because we're seeing an expanding backlog of Aerospace Products business with leasing companies, MROs, or maintenance repair, and overhaul organizations and airlines.

67. On September 6, 2023, FTAI participated in the Deutsche Bank Aircraft Finance & Leasing Conference where an analyst asked, "[M]oving on to your Aerospace Products division. When you look at your – when you look at the EBITDA ramp going from $100 million to $500 million by 2026. Do you see that being a linear path? And how do you expect to get there and what has to happen to get there?" Defendant Adams explained that the "biggest driver" of its EBITDA projections was The Module Factory within the Aerospace Products segment, accounting for $400 million of EBITDA out of its $500 million goal for 2026.

68. On December 1, 2023, FTAI announced its full ownership stake in the QuickTurn Engine Center ("QuickTurn") after acquiring Unical's 50% ownership interest. In the press release, Defendant Adams asserted that "[a]cquiring complete ownership of QuickTurn allows us to meet the rising demand for module products by our customers[.]" Chris Nagle, the Vice President of Commercial and Business Development at QuickTurn added, "We are excited to support FTAI's growing pipeline of CFM56 engine maintenance with our additional capacity[.] With the significant growth of module maintenance this year, we expect to become an industry leader in performing module swaps and light engine repairs."

69. In the wake of FTAI's full ownership of QuickTurn, analysts at Citi boosted the price target for FTAI from $50 to $54, writing that the higher valuation was justified by "greater integration on engine module production, along with ongoing robust module demand . . . ."

70. Further committing to its modular repair-focused business model, in January 2024, FTAI announced that it planned to fully acquire The Module Factory in Montreal for $170 million, using the 526,000 square-foot maintenance repair facility to increase FTAI's capacity for up to 900 CFM56 modules per year. The transaction closed on September 9, 2024.

71. During the April 26, 2024 Q1 2024 earnings call, Defendant Adams once again applauded the Aerospace Products segment:

> Aerospace Products had yet another excellent quarter with $70.3 million of EBITDA and an overall EBITDA margin of 37%. We sold 72 CFM56 modules in Q1 to 16 unique customers. Additionally, we sold 6 V2500 engines in Q1 to three customers through our recently launched V2500 Engine Program. We continue to see the tremendous potential in Aerospace Products and are comfortable that we will generate approximately $250 million of EBITDA in 2024, the high end of our previous range.

72. In light of the representations by Defendants, analysts believed that Aerospace Products was experiencing significant growth. For example, on April 25, 2024, BTIG reported that Aerospace Products "post[ed] another record quarter, with segment EBITDA up ~42% sequentially." The key takeaway, BTIG noted, was that "demand for FTAI's aftermarket services is robust and should continue to provide a nice tailwind as management continues to build out the business." Furthermore, BTIG explained that FTAI "is currently trading at ~14x consensus' 2024 EBITDA estimate of ~$700M," which is a "slight premium" compared to competitors, but that "we think a greater premium is warranted owing to rising aftermarket demand and the cross-selling opportunities engine sales create for the aftermarket business."

73. Also on April 25, 2024, Compass Point analysts concluded that "we view the Aerospace Products segment as the most important driver of value for FTAI near-term, the significant beat during the quarter should be viewed positively."

**4. By Using Adjusted EBITDA As A Key Performance Measure, And Urging A Focus On Aerospace Products, FTAI Increases Its Overall Valuation**

74. FTAI asserts that it "utilizes Adjusted EBITDA as [its] key performance measure" because it "provides [management] with the information necessary to assess operational performance, as well as make resource and allocation decisions."

75. It is no surprise, therefore, that FTAI regularly touts the impact of its quarterly and annual EBITDA for its Aerospace Products division. In its Form 8-K announcing the FY 2023 results, FTAI stated, "Q4 2023 Aerospace Products Adj. EBITDA of $55 million, bringing total segment Adj. EBITDA for 2023 to $160 million, up from $74 million in 2022." The division drove the Company's overall Adjusted EBITDA to $597 million for FY 2023. While FTAI's total revenues for the same period increased by $372.8 million. Directly prior to the Class Period on February 22, 2024 when announcing FY 2024 results, FTAI again lauded "[c]ontinued growth in Aerospace Products" which purportedly drove a 138% increase in overall Adjusted EBITDA year-over-year, which totaled $862 million. FTAI further reported that its Aerospace Products revenue increased by $276.5 million driven by a $213 million increase in engine sales.

76. Due to the distinct nature of each segment's revenue production and growth capabilities, analysts typically value FTAI's two segments at different growth multiples. A former FTAI executive explained that FTAI's aftermarket services are "a different type of business than just plain vanilla leasing, given that it's more focused on ***recurring*** revenue in terms of either providing maintenance and overhaul services or also selling actual aftermarket products[.]" A company that merely leases aircraft (e.g., FTAI's Leasing segment) is valued at "some multiple of book value, typically a pretty low multiple, 1.2X, 1.3X a book," while a company that can access a "more recurring revenue model," (e.g., FTAI's Aerospace Products segment) "gets valued at,

whatever, anywhere from 10X, 20X, 30X, 50X, 80X, whatever, revenue, depending on how the market treats it."

77. To calculate an overall valuation multiple for FTAI, analysts have used two different methodologies. Some analysts weigh each segment based on past and future performance (affording approximately one-third weight to Aviation Leasing and two-thirds weight to Aerospace Products) and blend the multiples to reach an overall Company valuation multiple. For example, in April 2024, Deutsche Bank analysts applied a multiple of 9x EBITDA to the Aviation Leasing division, whereas a multiple of ***26x EBITDA*** was used for the Aerospace Products division. Deutsche Bank analysts thus used a blended multiple of approximately 15x EBITDA.

78. Other analysts used a "sum-of-the-parts" analysis, where the Company is valued using the reported EBITDA and a multiple for each segment of the business, which are summed to obtain the overall valuation. Using this methodology, Wolfe Research arrived at a 14x EBITDA valuation overall. The Benchmark Company analysts applied a 9.6x EBITDA multiple to the Leasing division, but a ***27.7x EBITDA*** multiple to the Aerospace Products division.

79. Andre Madrid of BTIG explained, "[g]iven the company's focus on EBITDA, we value FTAI on a sum-of-the-parts EV/EBITDA basis, assuming a 10x multiple at Aviation Leasing and a 23x multiple on at Aerospace Products." Madrid felt the valuation was appropriate "given current peer levels" of FTAI.

80. Citi has noted that "[a] 17x multiple represents a ca. 30% premium to average aerospace multiples. This level seems reasonable, considering what looks like FTAI's unique opportunity to expand into the growing maintenance, repair & exchange (MRE) segment."

81. On October 30, 2024, Ken Herbert of RBC Capital Markets put a price target of $160 on FTAI after the release of Q3 2024 earnings. This was based on a 16x multiple, but there

was a stark difference between the multiples for Aviation Leasing versus Aerospace Products. RBC valued Aviation Leasing at a 10x multiple while valuing Aerospace Products at a 20.5x multiple. Herbert explained the difference, "[we] believe valuation upside will be driven by the burgeoning Aerospace Products segment . . . Aerospace Products could see significant top-line growth through increased module sales."

82. Other analysts valued FTAI at the same 16x EBITDA multiple. Although Kristine T. Liwag of Morgan Stanley valued a slightly slower price target of $140, the EBITDA multiple remained the same as RBC Capital. Likewise, Morgan Stanley used the blended multiples approach to value Aviation Leasing and Aerospace Products distinctly because of the significant difference in the multiple for each segment.

83. After FTAI's October 31, 2024 earnings call, Benchmark continued to show consensus amongst analysts in valuing Aerospace Products at twice the multiple of Aviation Leasing. Benchmark valued Aviation Leasing with a 9.9x EBITDA multiple and a 19.7x EBITDA multiple for Aerospace Products.

84. That same day, Barclays described how investors should view the Aerospace Products segment, stating, "FTAI's Aerospace Products business is much more akin to the maintenance, repair and overhaul" services. This indicated that maintenance was driving the 20x EBITDA multiples being attributed to Aerospace Products. Barclays emphasized this by stating, "we believe FTAI's Products business is worthy of a more elevated multiple given the higher profitability of the segment relative to competitors."

85. Given the foregoing, EBITDA and EBITDA growth in the Aerospace Products segment directly impacted the Company's overall valuation throughout the Class Period.

### B. During The Class Period, Defendants Misrepresented Aerospace Products' Financials To Create A Façade Of Fast-Paced Growth

86. In a scheme to fraudulently inflate FTAI's share price, Defendants employed a variety of deceptive accounting practices to falsely boost the Aerospace Products segment's EBITDA, EBITDA margins, EBITDA growth prospects, and revenues. The manipulation of these metrics misled investors as to the financial health and growth potential of the segment and served to increase the overall valuation of the business because of, as noted above, the differing valuation multiples applied to Aerospace Products and Aviation Leasing.

87. Given analysts' application of highly favorable valuation multiples to Aerospace Products versus Aviation Leasing, the importance of EBITDA in such valuations, and the correlation between EBITDA and share price, Defendants were motivated during the Class Period to falsely inflate the financials of Aerospace Products, even at the detriment of Aviation Leasing, and employed multiple tactics to exploit the growth multiple of Aerospace Products, ultimately misleading investors. Defendants profited handsomely as a result of this manipulation based on the Company's PSU compensation structure.

#### 1. Defendants Misleadingly Depreciated Assets That Aerospace Products Acquired From Aviation Leasing, Artificially Reducing Aerospace Products' Costs Of Goods Sold And Increasing Its EBITDA

88. In any given year, FTAI makes hundreds of millions of dollars in capital expenditures, acquiring aircraft and jet engines for lease or other uses. Given FTAI's focus, much of that capital expenditure is for jet engines. Regardless of the intended end-use of the acquired assets, all intact engines are recorded in Aviation Leasing, at inception. This is the case even where an asset is intended for use by Aerospace Products. Once FTAI acquires used aircraft and engines, the depreciation costs are recorded within the Aviation Leasing segment.

89. The new assets acquired by Aviation Leasing immediately were subject to depreciation. Pursuant to a September 2023 FTAI comment letter to the SEC, "For both aircraft and engines, depreciation begins when the asset is initially placed into service, which generally coincides with the date when the asset is ready for its intended use. Depreciation continues whether leased or not, until the asset is permanently removed from service." Pursuant to FTAI's accounting policies, leasing equipment was depreciated using the straight-line method. Under the straight-line method, depreciation is calculated by dividing the cost of the asset (less the estimated value of the asset at the end of its useful life) by the useful life of the asset.

90. While this is a standard calculation, FTAI intentionally applied a much shorter useful life to its engines held in Aviation Leasing than its peers during the Class Period. Specifically, and unknown to investors, FTAI assigned a useful life of 2-6 years to its aircraft engines. By comparison, FTAI's leasing peers assigned an engine a much longer useful life. Its leasing competitor Willis Lease Finance applied a useful life of 15 years, while its competitor AerCap estimated a useful life of 20 years. The very short useful life assigned by Aviation Leasing to engines resulted in a significant charge for depreciation in Aviation Leasing and a rapidly decreasing value for the newly acquired engine. Further, FTAI had substantial discretion in assigning a "residual value" to the newly acquired engine. It disclosed that residual value was calculated as the sum of engine core salvage value plus the estimated fair value of life limited parts. By reducing the expected residual value of an acquired engine, FTAI further increased depreciation and reduced the carrying value of the engine.

91. In many cases, the assets that were acquired and held by Aviation Leasing, and subject to depreciation in that segment, eventually were transferred to Aerospace Products pursuant to a non-cash transfer of assets. FTAI reported that in the first three quarters of 2024,

Aviation Leasing transferred 50 narrow-body engines like the CFM56 (the kind that Aerospace Products works on), but no widebody engines. The value of the equipment obtained by Aerospace Products was reduced by the depreciation that took place while that equipment was on the books of Aviation Leasing, thus reducing Aerospace Products' costs of goods sold, but without requiring it to bear the depreciation expenses. Aerospace Products could then sell these assets to its MRE customers. This maintained an artificially low cost of goods sold for the Aerospace Products segment, which, in turn, propped up its EBITDA and revenues.

92. Indicative of the extra depreciation being taken by Aviation Leasing to support artificially elevated levels of EBITDA at Aerospace Products, the amount of depreciation taken by Aviation Leasing as a percentage of its revenues increased by nearly 47% between 2023 and 2024. In the first three quarters of 2023, FTAI reported Aviation Leasing revenues of $527.8 million and depreciation of approximately $115 million. Depreciation thus constituted 21.8% of revenues. During the same period in 2024, Aviation Leasing revenues declined to $472 million, yet its depreciation increased to $151.2 million. Depreciation thus was 32% of revenues or a 47% increase over the prior year.

93. Because the engines that Aerospace Products sold to its customers was comprised of equipment that already has been depreciated by Aviation Leasing, Aerospace Products incurred significantly lower costs of goods sold than its MRO peers that did not have an associated leasing segment. FTAI's EBITDA margins in FY 2024, for example, were ten percentage points higher than much larger competitors, including Boeing and GE Commercial Engines and Services.

94. Further, it is clear that the engines transferred from Aviation Leasing were not old or worn out, but could be resold to Aerospace Products customers with little or no work required. In response to comments received from the SEC regarding its financial disclosures, during the

Class Period, FTAI changed the way it reported cash flows from operating activities and investment activities. Beginning in the Q3 2024 Form 10-Q, FTAI disclosed that it classified cash flow from operating activities in Aerospace Products as operating cash flow only "when the costs to manufacture the assets [i.e., make an engine or module resalable to Aerospace Products customers] are greater than ... the estimated value transferred from Leasing equipment into [Aerospace Products] inventory . . . ." Put differently, only when a transferred piece of equipment required substantial repairs that exceed the value of the equipment transferred was the cash flow upon sale recorded as operating cash flow. When minimal repairs are required, the ultimate cash flow was recorded by Aerospace Products as investing cash flow. In the first three quarters of 2024, applying this policy, FTAI adjusted its cash flow from Operating activities by $244 million in connection with gains on sale of assets. This implied that FTAI was required to perform limited work on these assets in order to sell them to third-party customers of Aerospace Products. This, in turn, demonstrated the relatively high quality of the assets transferred from Aviation Leasing (after being depreciated there) and the relatively small amount of work required to make engines saleable.

95. The relatively low cost to Aerospace Products of the engines obtained from Aviation Leasing also is supported by the substantial percentage of Aerospace Products' EBITDA that comes from the gain on sale of assets. During the first three quarters of 2024, Aerospace Products obtained 80% of its EBITDA from gains on sales, suggesting that the engines required little work to become saleable:

| Percentage of GAAP Gain on Sale Derived from AP Adj. EBITDA | Q1 2024 | Q2 2024 | Q3 2024 | YTD 2024 |
|---|---|---|---|---|
| Total gains on sale, per cash flow statement | 58.1 | 88.0 | 98.3 | 244 |
| Less: gains on sale booked to Leasing, per FTAI's supplement | (6.7) | (13.5) | (14.2) | (34) |
| Total AP gain on sale | 51.4 | 74.5 | 84.1 | 210 |
| Total adj EBITDA, AP, as reported | 70.3 | 91.2 | 101.8 | 263 |
| **AP gain on sale / AP reported adj EBITDA** | **73%** | **82%** | **83%** | **80%** |

96. This disclosure, like the cash flow disclosures discussed above, demonstrates that, overall, Aerospace Products undertook relatively little actual repairing of engine modules, but rather pieced together saleable engines from modules it acquired from various sources such as Aviation Leasing.

97. Finally, in Defendants' conference call with investors regarding the Q4 2024 and full year 2024 financial results for FTAI, the Individual Defendants discussed Aerospace Products' EBITDA margins in comparison to those of its competitors. While Defendant Adams stated that Aerospace Products had "an overall EBITDA margin of 34%," in responding to an analyst question about Aerospace Products' MRO competitors, he indicated that "[w]hen a typical MRO gets paid to fix something for someone, [] generally they're earning 15% margin for repair work." While Defendants Adams sought to attribute this stark differential to certain aspects of FTAI's business model, he conspicuously failed to address the accounting gimmicks used by Defendants that served to inflate Aerospace Products' EBITDA margins.

98. The boosted performance in Aerospace Products—made possible by the significant depreciation expenses absorbed while assets were on the books of Aviation Leasing—inflated Aerospace Products' EBITDA and EBITDA margins and misled investors into applying a higher EBITDA growth multiple to the segment that would not be justified without FTAI's accounting tricks.

### 2. Defendants Utilized Improper Accounting Determinations To Inflate Aerospace Products' EBITDA

#### a. Defendants Were Able To Manipulate Values For Aerospace Products Acquired Engines, As Well As The Values For Individual Engines/Modules That Are Retained In Aerospace Products' Inventory, Transferred To Aviation Leasing Or Sold To Customers

99. FTAI's Aerospace Products segment primarily generated revenues through its engine/module exchange rather than as a repair facility.[5] When an airline customer needed engine repairs or module replacements, the Company's practice was to exchange from its inventory a working engine or parts with the customer. Thus, rather than engaging in a time-consuming repair or overhaul of a customer engine/module, which can sometimes take weeks or months, Aerospace Products took the asset that needed repair in partial exchange (plus a cash component) for a working engine/module, which can be readily installed and have the aircraft in service much more quickly.

[5] Aerospace Products does provide engine repair services thru its QuickTurn facility in Miami, Florida. A former FTAI executive compared the Miami facility and The Module Factory in Canada as follows: "The facility down in Miami has much more limited capability than the facility up in Canada. The [Module Factory] facility is what we call a full-service, full-capability facility. *** The one down in Miami doesn't quite have the same capability, and it's a much smaller facility. It's literally, I don't even know, maybe 1/10 the size. What they do down in Miami is more what we call hospital visits. That's exactly what it sounds like, just going in and putting stitches on it and putting a band aid on it, giving a couple aspirin, and off you go again. It's more simple repairs."

100. FTAI touts this module/engine swap-out practice as the key to its competitive advantage versus competitors who instead focus on repairing actual customer engines and parts. This purported competitive advantage, however, permitted Defendants to perpetrate a fraud upon the investing public by deploying deceptive accounting practices to inflate Aerospace Products' EBITDA and revenues.

101. ***First***, when Aerospace Products accepted damaged engines as part of the compensation it received in a customer transaction, FTAI had the discretion to value the received engine in order to increase the value of the transaction, and thus its revenues and EBITDA.

102. ***Second***, while the overvaluation of engines received in swap transactions could lead to increased costs when the engine or its component parts are ultimately resold or scrapped, Aerospace Products was able to manipulate its inventory valuations to minimize the cost impact from the initial overvaluation. After receiving an overvalued engine as part of an exchange, Aerospace Products had discretion to assign book value to individual modules when deconstructing an engine. Thus, it had the ability to under allocate book value towards modules that were in working order with remaining useful life, or that only required minimal repairs, and which could be resold to customers, and at the same time overallocated book value to modules that required extensive repairs in order to be resold. This allowed Aerospace Products to understate its cost of sales with respect to engines/modules it has resold, thereby inflating its EBITDA. As a former FTAI senior employee explained:

> "[t]hey can assign different values to different modules . . . They may be assigning a really low book value to modules to show, like, a 35% EBITDA margin on that module, and a really high book value to the part, [spare parts for consumption not resale] because, you know, they don't need to make money on parts. They don't get the valuation for the company out of it, right?"

103. ***Third***, in order to further reduce cost with respect to the significantly overvalued modules that cannot be immediately resold (from the initial overvaluation of the exchange and

further overvaluation as a result of the disassembly), Aerospace Products had the ability to stash these overvalued modules in its inventory or transfer them to Aviation Leasing at the overvalued cost, where they were depreciated on Aviation Leasing's books.

104. The Snowcap Report shows how FTAI used its accounting discretion to inflate Aerospace Products' EBITDA:




**b. FTAI Utilized Deceptive Accounting Practices To Inflate Aerospace Products' EBITDA**

105. An analysis of FTAI's reported financials reveals that Aerospace Products did, in fact, use its accounting discretion as explained above to impact Aerospace Products' EBITDA.

106. Snowcap Research calculated that in Q1 2024, FTAI's inventories had an average book value of $1.54 million per CFM56 module. Snowcap calculated this number as follows:

**Inventory Value per Module**

| $m | Q4-22 | Q1-23 | Q2-23 | Q3-23 | Q4-23 | Q1-24 | Q2-24 | Q3-24 |
|---|---|---|---|---|---|---|---|---|
| Inventories | 164 | 193 | 232 | 275 | 317 | 346 | 373 | 491 |
| *# of engines* | | | | | | | | |
| CFM56 | 38 | 51 | 65 | 58 | 63 | 75 | 82 | 91 |
| V2500 | - | - | - | - | - | - | 35 | 61 |
| Other? | 1 | (1) | (1) | 2 | 2 | | | |
| Total # of engines in inventories | 39 | 50 | 64 | 60 | 65 | 75 | 117 | 152 |
| CFM56 Module Equivalents (x3) | 117 | 150 | 192 | 180 | 195 | 225 | NA | NA |
| Inventory value per Module | 1.40 | 1.29 | 1.21 | 1.53 | 1.62 | 1.54 | NA | NA |

*Source: Company Filings*

107. In the same quarter, based on detailed commentary provided in FTAI's earnings call, Snowcap estimated that the modules sold by Aerospace Products had an average book value of just $1.01 million, calculated as follows:

**Cost of Sales per Module Calc. (Q1-2024)**

| $m | Q1-24 | Notes |
|---|---|---|
| *Modules Sold* | 72 | *Reported* |
| *EBITDA per module* | 0.6 | *Transcript* |
| ***EBITDA from Module Sales*** | ***43.2*** | |
| *% Margin* | *35%* | *Transcript* |
| *Module Revenue* | *123.4* | |
| *Revenue per Module* | *1.71* | |
| *COGs % of Revenues* | *59%* | *Reported* |
| *Module COGs* | *72.4* | |
| **COGs per Module** | **1.01** | |

108. Accordingly, based upon Snowcap's analysis, the value of an inventory module sitting in inventory and awaiting repairs was 50% higher than the value of the modules actually sold.

109. These numbers, however, were inconsistent with the way the business operates. If FTAI's reporting was true, it would mean that Aerospace Products valued the engines in its inventory, which were likely awaiting or under repairs, or which had been repaired, significantly higher than the modules that Aerospace Products actually sold to customers (which either did not require or already had undergone repairs). There was no reason that modules awaiting sale should

be more valuable than already sold modules, unless Aerospace Products, as a result of the accounting manipulations noted above, had a much higher cost basis in those modules.

110. While a possible explanation could be that the types of modules in the inventory are more expensive core modules and thus have a higher book value on average, FTAI's data contradicts this potential explanation in that the engines it listed as available in its inventory were disproportionately cheaper fans and LPTs, not the more expensive cores:

**FTAI Module Store – Available Modules. Inventories Appear to Contain Mostly Low Value Modules**

| # of Modules | # | % |
|---|---|---|
| Cores | 6 | 13% |
| LPTs | 19 | 40% |
| Fans | 22 | 47% |
| Total | 47 | 100% |

*Source: FTAI Module Store*

111. This suggests that Aerospace Products, in fact, undervalued modules that it could readily sell, and overvalued engine modules that could not immediately be resold without work and were intrinsically less valuable, but which had an excessive cost basis due to the accounting manipulations described above.

112. In addition, in support of an assertion that FTAI may have eliminated some portion of the costs associated with the overvalued engines/modules that were not immediately resalable by sending them to Aviation Leasing, FTAI's disclosures show that significant assets were, in fact, transferred from Aerospace Products back to Aviation Leasing during the first three quarters of 2024. In FTAI's Q3 2024 Form 10-Q, the Company disclosed that Aerospace Products transferred nearly $160 million of its inventory to Aviation Leasing between January and September 2024. This was equivalent to approximately 50% of Aerospace Products' total inventories at the beginning of the year.

### 3. Defendants Knowingly Issued Falsely Inflated Revenue And EBITDA Results To Investors As A Result Of The Fraudulent Accounting Scheme

113. Based on Defendants' revolving-door accounting scheme between FTAI's Leasing and Products segments, which had the effect of falsely inflating the EBITDA, revenue, and growth prospects for Aerospace Products, Defendants knowingly caused to be released to the investing public materially false and misleading statements during the Class Period. Specifically, Defendants' statements misled investors by inflating Aerospace Products' reported EBITDA, EBITDA growth, and EBITDA margins by: (i) overvaluing engines acquired by Aerospace Products from third parties, (ii) improperly allocating the values of engines obtained by Aerospace Products from third parties among the various engine components, and (iii) depreciating assets within its Aviation Leasing division and then transferring depreciated assets to (and/or back to) the Aerospace Products division to be sold by Aerospace Products for an artificially high profit margin.

114. The Class Period begins on July 23, 2024. On that day, the Company announced its Q2 2024 financial results in a press release for the period ended June 30, 2024. The press release reported the Company's financial results and touted the Company's business highlights, including that Aerospace Products reached a "***new Adjusted EBITDA high of $91.2mm for Q2***."

115. These statements were false and misleading because the reported EBITDA numbers were falsely inflated by Defendants' misleading accounting practices.

116. During the accompanying Q2 2024 earnings call held on July 24, 2024, Defendant Adams again reported inflated results for Aerospace Products, lauding "***another excellent quarter with $91.2 million of EBITDA and an overall EBITDA margin of 37%***." Defendant Adams further announced the Company was raising the 2026 EBITDA guidance for the Aerospace Products segment from $550 million to $700 million.

117. Influenced by Defendants' rosy growth projections for the Aerospace Products division, Deutsche Bank reported on July 24, 2024 that "The Aerospace Products business continues to exceed expectations," and reiterated its "buy" rating of FTAI stock. The next day, on July 25, 2024, Deutsche Bank similarly raised its price target for FTAI to $125 based on "positive momentum in the Aero Products business." On August 8, 2024, Barclays reiterated FTAI's guidance, stating the Company was "on a favorable path of growth over the next two years."

118. FTAI filed its Q2 2024 financial report on Form 10-Q with the SEC on August 9, 2024. The Q2 Form 10-Q affirmed the previously announced quarterly financial results. On that same day, the Company provided an earnings supplement to be read in conjunction with the Company's Q2 2024 financial report. The earnings supplement reported adjusted EBITDA of $91.2 million for the quarter, an increase of 163% year-over-year. The financial report and supplement further reported the Aerospace Products segment had generated revenue of $245 million (representing a 160% year-over-year increase), attributed to increased sales of repaired engines and engine modules, spare parts, and used material inventory.

119. On September 5, 2024, FTAI participated in the Jefferies Global Industrial Conference. On that date Defendant Adams reaffirmed 2026 EBITDA guidance for the Aerospace Products segment in response to analyst questions. Defendant Adams further touted the growth that the segment was experiencing and stated that earning just 10% of market share would allow FTAI to meet its revised $1.25 billion EBITDA guidance for 2026.

120. On October 30, 2024, the Company issued a press release announcing Q3 2024 financial results and related supplement which reported adjusted EBITDA of $102 million, a 135% year-over-year increase. The financial documents further reported Aerospace Products had achieved adjusted EBITDA margins of 34% and revenue of $300.5 million year-to-date. On the

related October 31, 2024 earnings call, Defendant Adams touted "tremendous growth" from the Aerospace Products division, driving upward revisions of 2024 EBITDA guidance "to $360 million to $375 million, up from . . . previous estimate of $325 million to $350 million."

121. The Aerospace Products division's inflated results informed the analyst coverage in the days following the announcement of its earnings. For example, Compass Point reported on October 30, 2024 that FTAI announced EBITDA for Q3 2024 of $232 million, which was "driven by a significant beat at the aerospace products segment." The analyst report concluded, "Insofar as we view the products segment as the most important driver of value and upside for FTAI, the beat should be very well-received." On October 31, 2024, Barclays stated it was "bullish on the business" in response to the financial results, concluding that "FTAI's Products business is worthy of a more elevated multiple given the higher profitability of the segment relative to competitors."

122. Finally, on November 12, 2024, the Company submitted its quarterly report for the period ended September 30, 2024 on a Form 10-Q filed with the SEC, affirming the previously reported Q3 2024 results. Each of the alleged statements were false and misleading for the reasons noted above.

**C. Defendants' Scheme To Inflate EBITDA And Mislead Investors Is Revealed**

123. Investors began to learn the truth about Defendants' fraud through two corrective disclosures, leading to a drastic drop in FTAI's common stock price.

124. First, on January 15, 2025, Muddy Waters published the Muddy Waters Report. The Muddy Waters Report revealed that FTAI "Materially Manipulates Its Financials," engaged in a number of deceptive accounting practices to inflate the Company's EBITDA and misled investors as to the Company's finances and growth potential. The Muddy Waters Report revealed that FTAI was "[i]nflating Aerospace Products' EBITDA margins by means of over-depreciation

in the leasing segment," "[m]isleading investors by presenting whole engine sales as individual module sales," and "[e]ngaging in channel stuffing."

125. In response to this news, the price of FTAI shares declined $28.59 per share, or approximately 25%, from a close of $112.38 per share on January 17, 2025, to close at $83.79 per share on January 21, 2025.

126. Second, within days of the publication of the Muddy Waters Report, FTAI announced on January 21, 2025, that the Audit Committee of the Board of Directors determined on January 18, 2025, to "commence a review (which included the engagement of independent advisors) in response to" the Muddy Waters Report. In the Form 8-K filed with the SEC announcing the investigation, FTAI also disclosed that "the filing of Company's Annual Report on Form 10-K for fiscal year 2024 [ ] may be delayed."

127. In response to this news, the price of FTAI shares declined $28.59 per share, or approximately 25%, from a close of $112.38 per share on January 17, 2025, to close at $83.79 per share on January 21, 2025.

### D. After The End Of The Class Period, A Second Analyst Reported Issues With FTAI's Financial Reporting, While FTAI Rapidly Concluded Its Self-Serving Investigation And Claimed No Wrongdoing

128. On January 29, 2025, Snowcap published the Snowcap Report regarding FTAI's deceptive accounting practices. Snowcap echoed the findings from the Muddy Waters Report, and provided new additional findings following a "3-month investigation into FTAI" including that FTAI used "inventory accounting games" to significantly inflate the Aerospace Products segment's EBITDA and the Aerospace Products segment luckily benefited "from one-off [g]ains generated from buying [Aviation] Leasing engines at bargain prices during Covid." Snowcap asserted that FTAI's Aerospace Products segment and its success were "in substance an elaborate fabrication."

129. Just one month after the publication of Muddy Waters' explosive report, FTAI's Audit Committee announced on February 20, 2025, that it had "completed its review" into the allegations of the report and "determined that the allegations made against the Company are without merit." The Company further announced that it expected to file its annual Form 10-K on time. No further details were provided about the results of the rapid investigation and, tellingly, the details of the Audit Committee's findings have never been released.

## V. DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD AND ANALYSTS ACCEPTED THOSE STATEMENTS

### A. Second Quarter 2024 Financial Results

130. The Class Period begins on July 23, 2024. On that day, the Company announced its Q2 2024 financial results in a press release for the period ended June 30, 2024. The press release reported the Company's financial results and touted the Company's business highlights, including that Aerospace Products reached a "***new Adjusted EBITDA high of $91.2mm for Q2***." The press release stated that the Company "utilizes Adjusted EBITDA as our key performance measure" as it "provides the CODM [Chief Operating Decision Maker] with the information necessary to assess operational performance, as well as make resource and allocation decisions." The press release also reported the Company's relevant key financial metrics including: adjusted EBITDA, Aerospace Products' revenue, maintenance revenue, asset sales revenue, lease income cost of sales, the value of leasing and inventory assets, depreciation and amortization expenses. Specifically, the press release stated, in relevant part:

**Business Highlights**

- ***Aerospace Products reaches new Adjusted EBITDA high of $91.2mm for Q2***.

* * *

| | Three Months Ended June 30, | |
|---|---|---|
| | 2024 | 2023 |
| **Revenues** | | |
| Lease income | $ 70,754 | $ 59,541 |
| Maintenance revenue | 51,187 | 42,065 |
| Asset sales revenue | 72,433 | 76,836 |
| Aerospace products revenue | 245,200 | 92,725 |
| Other revenue | 4,020 | 3,178 |
| Total revenues | 443,594 | 274,345 |
| | | |
| **Expenses** | | |
| Cost of sales | 205,857 | 104,532 |
| Operating expenses | 29,099 | 24,797 |
| General and administrative | 2,969 | 3,188 |
| Acquisition and transaction expenses | 8,019 | 2,672 |
| Management fees and incentive allocation to affiliate | 3,554 | 5,563 |
| Internalization fee to affiliate | 300,000 | — |
| Depreciation and amortization | 56,691 | 38,514 |
| Asset impairment | — | — |
| Interest expense | 55,196 | 38,499 |
| Total expenses | 661,385 | 217,765 |

* * *

131. Also on July 23, 2024, the Company provided an earnings supplement in conjunction with the Company's Q2 2024 financial report. The earnings supplement reported the Company's purported Aviation Leasing and Aerospace Products segment EBITDAs and further reported additional key metrics for the Company's Aerospace Products segment. Specifically, the earnings supplement stated, in relevant part:

## Financial Results Overview

**Business Segment Highlights**

1) Aviation Leasing:

- $125.0 million Q2 2024 Adj. EBITDA[2] comprised of:
  - $111.5 million Leasing Adj. EBITDA
  - $13.5 million Gains on Sales

2) Aerospace Products:

- 163% Quarterly Adj. EBITDA growth versus Q2 2023[2]
- Sold 82 CFM56 modules in Q2 2024

| *$s in millions* | Q2 2024 |
|---|---|
| Net Income Attributable to Shareholders | $(228.2) |
| Internalization Fee to Affiliate | $300.0 |
| Net Income Excluding Internalization Fee | $71.8 |
| Adj. EBITDA[2] | |
| Aviation Leasing | $125.0 |
| Aerospace Products | $91.2 |
| Corporate & Other | $(2.3) |
| FTAI Consolidated | $213.9 |

* * *

# Aerospace Products

## Highlights & Key Metrics

- Q2'24 Total Revenue growth of 164.5% versus Q2 2023
- 82 modules sold in Q2 2024
- Consistently generating Adj. EBITDA margins of between 30% - 40%
- 06/30 Engine parts inventory of $373.3mm to support backlog

| *Aerospace Products Margin* *($s in millions)* | Q2'23 | Q1'24 | Q2'24 |
|---|---|---|---|
| Total Revenue | $92.7 | $189.1 | $245.2 |
| Adj. EBITDA[1] | $34.7 | $70.3 | $91.2 |
| Adj. EBITDA Margin %[2] | 37% | 37% | 37% |

## Aerospace Products Performance

*($s in millions)*

| *Statement of Operations* | *Q2'23* | *Q3'23* | *Q4'23* | *Q1'24* | *Q2'24* |
|---|---|---|---|---|---|
| *Total Revenue* | $92.7 | $118.7 | $158.5 | $189.1 | $245.2 |
| *Total Expenses* | $(58.5) | $(76.4) | $(110.3) | $(119.6) | $(154.8) |
| *Other*[3] | $(0.9) | $(1.0) | $32.4 | $(3.1) | $(5.5) |
| *Net Income Attributable to Shareholders* | $33.3 | $41.3 | $80.6 | $66.4 | $84.9 |
| *Adjusted EBITDA*[1] | $34.7 | $43.3 | $54.6 | $70.3 | $91.2 |




* * *

132. During the accompanying Q2 2024 earnings call held on July 24, 2024, Defendant Adams again reported inflated results for Aerospace Products:

> ***Aerospace Products had yet another excellent quarter with $91.2 million of EBITDA and an overall EBITDA margin of 37%.*** We're seeing tremendous growth in the aerospace products business in general and feel good about raising our estimates for 2024 EBITDA in aerospace products from our prior estimate of $250 million, up to $325 million to $350 million. We also are experiencing expansion in aerospace products margins as demand for refurbished modules and engines remains very high, while increasing efficiencies at our two CFM56 maintenance facilities in Montreal and Miami is controlling or in some cases lowering our costs.

133. Defendant Adams then announced revisions of the long-term EBITDA projections, which recognized the outsized impact and growth potential of Aerospace Products. The Company's former goal projected $1 billion of EBITDA in 2026, comprised of $500 million equally from Leasing and Products. The new forecast increased the goal to $1.25 billion of EBITDA in 2026, "***comprised of $550 million of Leasing EBITDA and $700 million of aerospace products EBITDA***."

134. Influenced by Defendants' rosy growth projections for the Aerospace Products division, Deutsche Bank reported on July 24, 2024 that "The Aerospace Products business continues to exceed expectations," and reiterated its "buy" rating of FTAI stock.

135. On July 25, 2024, Deutsche Bank similarly raised its price target for FTAI to $125 and further explained:

> Based on the June Q EBITDA beat and the positive momentum in the Aero Products business, we are raising our 2024E EBITDA from $729 million to $829 million. We're also increasing our 2025E EBITDA from $884 million to $936 million. As a result, we are raising our 12-month price target from $120 to $125 and maintain our Buy rating on the shares of FTAI.

136. On August 8, 2024, Barclays reiterated FTAI's guidance, "Adding it up, management's revised 2026 EBITDA guidance of $550mm in leasing and $700mm Aerospace Products (including $100mm to $150mm from the recently expanded V2500 engine program),

display a high level of confidence and, if achieved, would represent material benefit for FTAI shareholders even from current stock levels." The analyst concluded the Company was "on a favorable path of growth over the next two years."

137. FTAI filed its Q2 2024 financial report on Form 10-Q with the SEC on August 9, 2024. The Q2 Form 10-Q affirmed the previously announced quarterly financial results. The Q2 Form 10-Q also included certain financial results (e.g., revenue, cash flow, inventory, etc.) from the Company's Q4 2023 (ended December 31, 2023) for purposes of comparing FTAI's quarterly results for both periods. FTAI also provided that the Q2 Form 10-Q "should be read in conjunction with the Consolidated Financial Statements and related notes included in the Company's Annual Report on Form 10-K for the year ended December 31, 2023."

138. The Company's Aerospace Products segment generated quarterly revenue of approximately $245 million (representing a 160% year-over-year increase), which was attributed to increased sales of repaired engines and engine modules, spare parts, and used material inventory. Additionally, the Aerospace Products segment reported quarterly adjusted EBITDA growth of 163% year-over-year.

139. The above statements identified in ¶¶130-33 & 137-38 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects because Defendants were inflating Aerospace Products' reported revenue, EBITDA, EBITDA growth, and EBITDA margins, as well as the purported growth prospects for Aerospace Products, by (i) overvaluing engines acquired by Aerospace Products from third parties, (ii) improperly allocating the values of engines obtained by Aerospace Products from third parties among the various engine components, and (iii) depreciating assets within its Aviation Leasing

division and then transferring depreciated assets to (and/or back to) the Aerospace Products division to be sold by Aerospace Products for an artificially high profit margin.

140. Specifically, statements regarding "record" EBITDA, revenue, margins, and growth trajectory for Aerospace Products caused to be issued and approved by the Individual Defendants in FTAI's earnings materials and related documents, as well as statements made by Defendant Adams in the related earnings call, were materially false and misleading because they failed to disclose such financial results were driven by asset transfers from Aviation Leasing which had been pre-depreciated with an understated useful life of 2-6 years, which was a mere fraction of the useful life of 15-20 years used by FTAI's peers.

141. Further, statements regarding Aerospace Products EBITDA growth omitted that such growth was dependent on overstating and manipulating the fair value of modules and components received by customers in Aerospace Products' engine exchanges. Fungible parts were assigned low values to boost EBITDA in future exchange-sales, whereas other parts were assigned high values and were transferred to Aviation Leasing to depreciate those parts, avoid an impairment charge that would have resulted if kept in inventory at artificially high values, and allow for those parts to be transferred back to Aerospace Products at low cost, thus inflating margins when they were resold.

142. Moreover, statements regarding year-over-year revenue and EBITDA increases were materially false and misleading insofar as they were not the result of the growing success of the business but the fruition of Defendants' accounting scheme deployed on or around the time when FTAI became an internally managed company.

143. Defendant Adams's statement regarding Aviation Leasing EBITDA versus Aerospace Products EBITDA was further materially false and misleading because it omitted that

FTAI was depreciating assets in, and at the expense of, the Leasing division in order to boost the EBITDA of Aerospace Products.

144. All told, Defendants' statements misled the investing public by omitting information that would show that the profit margins fueling FTAI's purportedly revolutionary MRE business and EBITDA were illusory and the product of Defendants' accounting scheme to artificially inflate the price of FTAI shares. During the Class Period, the Individual Defendants profited handsomely therefrom as a result of FTAI's compensation structure.

145. As a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were knowingly and/or recklessly materially false and misleading when made.

**B. Jefferies Global Industrial Conference**

146. On September 5, 2024, FTAI participated in the Jefferies Global Industrial Conference. Jeffries analyst Sheila Kahyaoglu praised the Aerospace Products division's performance and asked,

> And maybe if you could talk about Aerospace Products and your businesses about Aerospace Products as EBITDA poised to grow from $160 million in 2023 to $325 million to $350 million in 2024 and $700 million by 2026, you've done over 150 modules in the first half of this year and run rating well above 300 modules compared to the 178 modules in 2023. How do you assess the market opportunity today as it seems like everything is going your way and in terms of larger set of customers and more work per customer?

147. Defendant Adams stressed the growth that the segment was experiencing and stated that earning just 10% of market share would allow FTAI to meet its revised $1.25 billion EBITDA guidance for 2026:

> Yes. We originally set a goal of $1 billion of EBITDA by 2026. And we sort of built that up, assuming that we would grow our customers from 25 to 50, we do more modules per customer growing that from 4 to 8. And ***we're well ahead of those numbers***. So, ***we recently revised that aspirational goal for 2026 to $700***

> ***million up from $500 million***. And roughly to do that, ***I think we need about a 10% market share of the CFM56 market and a similar amount on the V2500***.

148. The above statements identified in ¶¶146-47 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects because Defendants were inflating Aerospace Products' reported revenue, EBITDA, EBITDA growth, and EBITDA margins, as well as the purported growth prospects for Aerospace Products, by (i) overvaluing engines acquired by Aerospace Products from third parties, (ii) improperly allocating the values of engines obtained by Aerospace Products from third parties among the various engine components, and (iii) depreciating assets within its Aviation Leasing division and then transferring depreciated assets to (and/or back to) the Aerospace Products division to be sold by Aerospace Products for an artificially high profit margin.

149. The foregoing statement by Defendant Adams was materially false and misleading when made for the same reasons as described *supra* ¶¶140-41. Defendant Adams's statement regarding required market share to reach FTAI's Aerospace Products' EBITDA goal for 2026, was further false and misleading as such projections were premised on FTAI's deceptive accounting practices. Had FTAI calculated depreciation consistent with its peers, the Company would have needed to acquire a much larger market share to meet its EBITDA goals.

150. All told, Defendant Adams's statement misled the investing public by omitting information that would show that the profit margins fueling FTAI's purportedly revolutionary MRE business and EBITDA were illusory and the product of Defendants' accounting scheme to artificially inflate the price of FTAI shares. During the Class Period, the Individual Defendants profited handsomely therefrom as a result of FTAI's compensation structure.

151. As a result of the foregoing, Defendant Adams's positive statements about the Company's business, operations, and prospects were knowingly and/or recklessly materially false and misleading when made.

152. Analysts continued to praise FTAI and raise price targets as a result of Defendants' materially false and misleading statements. On September 26, 2024, Compass Point increased its price target on FTAI from $119 to $156 based on a rating that is 14x EBITDA estimates. The report credited the growth of the Aerospace Products division:

> FTAI's performance so far has been materially above expectations over the past few quarters beating every forecast at the aerospace products segment - it's worth noting that we believe the aerospace products segment is the most valuable part of FTAI and the largest source of future upside for FTAI shares.

153. The report added that "Aerospace Products EBITDA upside is underappreciated." Buying into Defendants' exaggerated growth story, the Compass Point analysts predicted in the long term that "the combined Aerospace Products segment could generate ~$850M+ to $900M+ of EBITDA in 2026," which was higher than the Company's own forecast of $700M of EBITDA from the segment.

**C. Third Quarter 2024 Financial Results**

154. On October 30, 2024, the Company issued a press release announcing its Q3 2024 financial results in a press release for the period ended September 30, 2024. The press release reported the Company's financial results and touted the Company's business highlights, including earnings of "***over $100 million Adjusted EBITDA in Aerospace Products***." The press release maintained that the Company "utilizes Adjusted EBITDA as our key performance measure" as it "provides the CODM [Chief Operating Decision Maker] with the information necessary to assess operational performance, as well as make resource and allocation decisions." The press release also purported to report the Company's relevant key financial metrics including: adjusted

EBITDA, Aerospace Products' revenue, maintenance revenue, asset sales revenue, lease income cost of sales, the value of leasing and inventory assets, depreciation and amortization expenses. Specifically, the press release stated, in relevant part:

**Business Highlights**

- ***FTAI reports over $100 million Adjusted EBITDA in Aerospace Products.***

* * *

| | Three Months Ended September 30, | |
|---|---|---|
| | **2024** | **2023** |
| **Revenues** | | |
| Lease income | **$ 65,450** | $ 45,622 |
| Maintenance revenue | **59,917** | 63,925 |
| Asset sales revenue | **34,953** | 61,400 |
| Aerospace products revenue | **303,469** | 118,675 |
| Other revenue | **2,005** | 1,474 |
| Total revenues | **465,794** | 291,096 |
| | | |
| **Expenses** | | |
| Cost of sales | **219,496** | 116,707 |
| Operating expenses | **26,858** | 33,887 |
| General and administrative | **4,045** | 3,015 |
| Acquisition and transaction expenses | **9,341** | 4,261 |
| Management fees and incentive allocation to affiliate | **—** | 4,577 |
| Internalization fee to affiliate | **—** | — |
| Depreciation and amortization | **56,775** | 43,959 |
| Asset impairment | **—** | — |
| Interest expense | **57,937** | 40,185 |
| Total expenses | **374,452** | 246,591 |

* * *

155. Also on October 30, 2024, the Company provided an earnings supplement in conjunction with the Company's Q3 2024 financial report. The earnings supplement reported the Company's purported Aviation Leasing and Aerospace Products segment EBITDA results, as well as key metrics for the Company's Aerospace Products segment, including that the Company has an "Annual Shop Visit Capacity for 1,350 CFM56 Modules." Specifically, the earnings supplement stated, in relevant part:

## Financial Results Overview

**Business Segment Highlights**

1) Aviation Leasing:

- $136.4 million Q3 2024 Adj. EBITDA[1] comprised of:
  - $122.2 million Leasing Adj. EBITDA
  - $14.2 million Gains on Sales

2) Aerospace Products:

- Generated Revenue of $303.5 million
- 135% Quarterly Adj. EBITDA growth versus Q3 2023[1]

| *$s in millions* | Q3 2024 |
|---|---|
| Net Income Attributable to Shareholders | $78.1 |
| Adj. EBITDA[1] | |
| Aviation Leasing | $136.4 |
| Aerospace Products | $101.8 |
| Corporate & Other | $(6.2) |
| FTAI Consolidated | $232.0 |

* * *

# Aerospace Products

## Highlights & Key Metrics

- Q3'24 Total Revenue growth of 155.7% versus Q3 2023
- Annual Shop Visit Capacity for 1,350 CFM56 Modules
- Consistently generating Adj. EBITDA margins of between 30% - 40%
- 09/30 Engine parts inventory of $491.0mm to support backlog

| *Aerospace Products Margin* (*$s in millions*) | Q3'23 | Q2'24 | Q3'24 |
|---|---|---|---|
| Total Revenue | $118.7 | $245.2 | $303.5 |
| Adj. EBITDA[1] | $43.3 | $91.2 | $101.8 |
| Adj. EBITDA Margin %[2] | 36% | 37% | 34% |

## Aerospace Products Performance

*($s in millions)*

| *Statement of Operations* | *Q3'23* | *Q4'23* | *Q1'24* | *Q2'24* | *Q3'24* |
|---|---|---|---|---|---|
| *Total Revenue* | $118.7 | $158.5 | $189.1 | $245.2 | $303.5 |
| *Total Expenses* | $(76.4) | $(110.3) | $(119.6) | $(154.8) | $(204.8) |
| *Other*[3] | $(1.0) | $32.4 | $(3.1) | $(5.5) | $(4.9) |
| *Net Income Attributable to Shareholders* | $41.3 | $80.6 | $66.4 | $84.9 | $93.8 |
| *Adjusted EBITDA*[1] | $43.3 | $54.6 | $70.3 | $91.2 | $101.8 |



156. On October 31, 2024, during the Q3 2024 earnings call, Defendant Adams reported strong growth from the Aerospace Products division, driving upward revisions of EBITDA guidance:

> ***Aerospace Products had yet another excellent quarter with $101.8 million of EBITDA and an overall EBITDA margin of 34%, which is up 12% compared to $91.2 million in Q2 of this year, and up 135% compared to $43.3 million in Q3 2023. We're seeing tremendous growth and adoption and usage of our Aerospace Products that are increasing our 2024 estimated EBITDA to $360 million to $375 million, up from our previous estimate of $325 million to $350 million.***

157. During the call, Compass Point analyst Giuliano Bologna again focused on the segment's growth, asking, "Something I was curious about was you've obviously done a great job on the product segment, continuing to scale and grow the platform. I'm curious where you see a lot of the growth coming from at this point, and if there's been any kind of distribution between new customer growth or volume growth and how those trends have continued to evolve." Defendant Adams attributed the segment's positive results to "organic growth" and further emphasized the growth potential:

> …I mean, ***it is more organic growth***. As we've said, we're focusing on the two largest engine markets in the world. Virtually every airline in the world operates a V2500 or a CFM56 engine, and we're still under 5% market share. So, ***our focus is organic growth***. And as I mentioned, ***as an example with using the facility at FTAI Canada, we're able to triple the productivity with the same number of people. So the organic growth opportunity for us is right in front of us and it's extraordinary. And so, we're not really focusing on anything other than that.***

158. The Aerospace Products division's inflated results informed the analyst coverage in the days following the announcement of its earnings. For example, Compass Point reported on October 30, 2024 that FTAI announced EBITDA for Q3 2024 of $232 million, which was "driven by a significant beat at the aerospace products segment." The analyst report concluded, "Insofar as we view the products segment as the most important driver of value and upside for FTAI, the beat should be very well-received."

159. While Barclays expressed some doubts in its coverage about the Company's performance on October 31, 2024, any concerns were quelled by Defendants' misleading assurances about the segment's growth:

> We could pick at the Aerospace Products segment operating margin, which declined sequentially, but management called out a 200-300 bps headwind from legacy contracts at the newly acquired FTAI Canada facility. Despite this, management raised guidance for 2024 in the Aerospace Products segment, which is not surprising in retrospect as the company had increased the Products outlook during the three most recent prior calls. Investors have ratcheted up expectations for 2025 given the steep path to 2026 guidance (a 13% EBITDA CAGR from annualized 3Q levels), but we view the quarter and near-term outlook as indicative of solid momentum in the business.

160. Despite its doubts, the Barclays report explained that "FTAI's Aerospace Products business is much more akin to the maintenance, repair and overhaul ('MRO') services," and that "[W]e believe FTAI's Products business is worthy of a more elevated multiple given the higher profitability of the segment relative to competitors." In sum, Barclays analysts stated, "Nonetheless, we remain bullish on the business and expect to see continued outsized growth into next year as the company exercises full control over FTAI Canada."

161. On November 3, 2024, Compass Point analysts explained that "With the second PMA part approved, FTAI just realized a significant catalyst that should accelerate EBITDA growth at FTAI's Aerospace Products segment in the near and medium-term that should also support incremental multiple expansion." The analysts then indicated that they were "increasing our FTAI price target to $175 based on 15.5x our FY26E EBITDA of $1,313.8M. In our updated valuation, we increased our multiple to 15.5x, from 14x but believe a multiple in the 16x-20x range could be warranted over time."

162. On November 12, 2024, the Company submitted its quarterly report for the period ended September 30, 2024 on a Form 10-Q filed with the SEC, affirming the previously reported

financial results. The Q3 2024 10-Q described the purported nature of the Company's revenue, stating in relevant part:

> **Revenues**
>
> Comparison of the three months ended September 30, 2024 and 2023
>
> Total revenues increased by $174.7 million, driven by the following:
>
> - ***Aerospace products revenue increased by $184.8 million, primarily due to a $164.3 million increase in CFM56-7B, CFM56-5B and V2500 engine and module sales, a $9.6 million increase in parts inventory sales, and other sales revenue of $7.7 million from the QuickTurn and [Module Factory] acquisitions***.
> - Lease income increased by $19.8 million, primarily due to increases in aircraft lease revenue of $10.0 million, engine lease revenue of $7.2 million, and a decrease in lease incentive amortization of $4.1 million. Aircraft and engine revenue both increased due to an increased number of assets on lease in Q3 2024 compared to Q3 2023. This was partially offset by a decrease of $1.5 million in the Offshore Energy business driven by one of our vessels in the Offshore Energy business having fewer days on-hire in 2024 compared to 2023.
> - Asset sales revenue decreased by $26.4 million, primarily due to an overall decrease in the number of sales transactions of commercial aircraft and engines. Specifically, one aircraft was sold in Q3 2024 as compared to one aircraft and eight engines sold in Q3 2023.
> - Maintenance revenue decreased by $4.0 million. Aircraft maintenance revenue decreased by $14.8 million from Q3 2023 to Q3 2024, due to $18.2 million of higher maintenance reserves taken into revenue in Q3 2023, partially offset by an increased number of aircraft on lease in Q3 2024 generating maintenance revenue as compared to Q3 2023. This decrease in aircraft maintenance revenue was partially offset by increased engine maintenance revenue of $10.8 million, driven by an increased number of engines on lease in Q3 2024 generating maintenance revenue as compared to Q3 2023.

163. As with the Q2 Form 10-Q, the Q3 Form 10-Q compared the Q3 2024 financial results to certain financial results from the Company's Q4 2023 (ended December 31, 2023) and stated that the Q3 Form 10-Q "should be read in conjunction with the Consolidated Financial Statements and related notes included in the Company's Annual Report on Form 10-K for the year ended December 31, 2023."

164. The above statements identified in ¶¶154-57, 162-63 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects because Defendants were inflating Aerospace Products' reported revenue, EBITDA, EBITDA growth, and EBITDA margins, as well as the purported growth prospects for Aerospace Products, by (i) overvaluing engines acquired by Aerospace Products from third parties, (ii) improperly allocating the values of engines obtained by Aerospace Products from third parties among the various engine components, and (iii) depreciating assets within its Aviation Leasing division and then transferring depreciated assets to (and/or back to) the Aerospace Products division to be sold by Aerospace Products for an artificially high profit margin.

165. The foregoing statements caused to be issued and approved by the Individual Defendants in FTAI's 3Q 2024 financial materials and statements made by Defendant Adams in the related earnings call were materially false and misleading when made for the same reasons as described *supra* ¶¶140-44.

166. The foregoing statements regarding quarterly EBITDA and margin improvements in FTAI's Q3 2024 financial materials, as well as statements made by Defendant Adams in the related earnings call were additionally materially false and misleading because they failed to disclose such financial results were driven by asset transfers from Aviation Leasing which had been pre-depreciated with an understated useful life of 2-6 years ,which was a fraction of the useful life of 15-20 years used by FTAI's peers.

167. Further, statements regarding Aerospace Products' EBITDA growth and increased EBITDA guidance omitted that such growth was dependent on overstating and manipulating the fair value of modules and components received by customers in Aerospace Products exchanges. were assigned high values and were transferred to Aviation Leasing to depreciate those parts, avoid

an impairment charge that would have resulted if kept in inventory at artificially high values, and allow for those parts to be transferred back to Aerospace Products at low cost, thus inflating margins when they were resold. EBITDA

168. Additionally, the 3Q 2024 10-Q attribution of module sales as the primary driver of FTAI's revenue increases was false and misleading as it omitted that module revenue in the Aerospace Products segment was materially and falsely inflated as a result of Defendants truncated depreciation in Aviation Leasing and overstated and manipulated fair value accounting in Aerospace Products.

169. Moreover, statements regarding year-over-year revenue and EBITDA increases and quarterly margin increases were materially false and misleading insofar that they were not the result of the growing success of the business but the fruition of Defendants' accounting scheme deployed on or around the time when FTAI became an internally managed company.

170. Defendant Adams's statement regarding Aviation Leasing EBITDA versus Aerospace Products EBITDA was further materially false and misleading because it omitted that FTAI was depreciating assets in, and at the expense of, the leasing division in order to boost the EBITDA of Aerospace Products.

171. Finally, Defendant Adams's statement that FTAI's organic growth was the catalyst for the Company's present and future financial result was materially misleading insofar that the Aerospace Products segment's EBITDA and revenues were dependent on Defendants fraudulent accounting scheme, meaning FTAI would need to capture far more market share if it, *inter alia*, calculated the useful life of its engines consistent with its peers.

172. All told, Defendants' statements misled the investing public by omitting information that would show that the profit margins fueling FTAI's purportedly revolutionary

MRE business and EBITDA were illusory and the product of Defendants' accounting scheme to artificially inflate the price of FTAI shares. During the Class Period, the Individual Defendants profited handsomely therefrom as a result of FTAI's compensation structure.

173. As a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were knowingly and/or recklessly materially false and misleading when made.

## VI. LOSS CAUSATION

174. Defendants' wrongful conduct alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiffs and the Class. During the Class Period, Lead Plaintiffs and the Class purchased FTAI's common stock at artificially inflated prices and were damaged thereby when the price of FTAI's common stock declined after the truth was revealed.

175. Throughout the Class Period, the price of FTAI's common stock was artificially inflated and/or maintained as a result of the Defendants' materially false or misleading statements and omissions. As set forth above in Section V, numerous market participants republished Defendants' statements regarding the sale of engine modules and inflated revenue. Market participants also attributed the rapid increase in the Company's stock price during the Class Period to Defendants' statements regarding the sale of engine modules and purported revenue.

176. On January 15, 2025, Muddy Waters issued the Muddy Waters Report detailing significant problems with FTAI's public statements regarding Aerospace Products' and issues with Aerospace Products' EBITDA. In particular, Muddy Waters disclosed that the key performance indicator that Defendants repeatedly cited to investors as a basis for Aerospace Products allegedly strong performance – EBITDA – was fraudulently inflated and Aerospace Products' actual financial performance was not in accord with the information reported by Defendants. In direct response to this news, the price of FTAI ordinary shares declined $37.21 per share, or

approximately 24%, from a close of $153.29 per share on January 14, 2025, to close at $116.08 per share on January 15, 2015.

177. *Forbes* attributed the share price drop on January 15, 2025, directly to the Muddy Waters publication, noting that the "sharp 24% fall" was "attributed to a report published by Muddy Waters Research alleging that FTAI manipulates its financials," which "didn't sit well with investors."

178. At the end of the Class Period on January 21, 2025, the Company, providing substantial credence to Muddy Waters' claims, announced that its Audit Committee had "commenced a review" of Muddy Waters' allegations. As a result of this announcement, the price of FTAI stock declined another $28.59 per share, or approximately ***25%***, from a close of $112.38 per share on January 17, 2025, to close at $83.79 per share on January 21, 2025.

179. Following the announcement of the internal investigation and the potential delay of the annual report, analysts expressed surprise. Wolfe Research, for example, wrote that "[W]e were not expecting a launch of an investigation" and that "we were also surprised the company is anticipating a potential delay in the 10-K filing."

180. It was entirely foreseeable that Defendants' materially false or misleading statements and omissions discussed herein would artificially inflate and/or maintain the price of FTAI's common stock. It was also foreseeable to Defendants that the revelation of the truth would cause the price of FTAI's common stock to fall when the artificial inflation caused or maintained by Defendants' misstatements and omissions was removed. Thus, the stock price decline described above was directly and proximately caused by Defendants' materially false or misleading statements and omissions.

## VII. ADDITIONAL ALLEGATIONS OF SCIENTER

181. As alleged herein, Defendants acted with scienter because Defendants: (i) knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; (ii) knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public, and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

182. Further, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding FTAI, their control over, receipt, and/or modification of FTAI's allegedly materially misleading statements and omissions, and/or their positions with the Company, which made them privy to confidential information concerning FTAI, participated in the fraudulent scheme alleged herein.

### A. Defendants Adams And Nam Were Financially Motivated To Commit Securities Fraud And Manipulate Accounting Figures

183. As explained above, FTAI used subjective and misleading accounting determinations to inflate and manipulate EBITDA for the Aerospace Products segment. Defendants Adams and Nam were financially incentivized to tout FTAI's performance (and in particular with respect to Aerospace Products' EBITDA) and deceive the investing public because they stood to receive large performance-based stock units ("PSUs") under a redesigned executive compensation scheme tied in significant part to the Company's share price.[6]

[6] On May 28, 2024, prior to the Class Period, FTAI completed an "internalization process" in which its management function began operating as an internally managed company. Prior to internalization, FTAI's former Manager was responsible for all executive compensation decisions. During this time, Defendant Adams "devoted a substantial portion" of his time to FTAI – although

184. Specifically, under FTAI's compensation policy, which was determined by the Company's Compensation Committee, the Individual Defendants were entitled to certain PSUs. Critically, the value of the award granted to Defendants under this compensation structure was determined based on the "Annualized TSR (CAGR) of [FTAI's] Ordinary Shares." TSR CAGR (Total Shareholder Return based on a Compound Annual Growth Rate) refers to capital gains (i.e., the increase in the company's stock price) plus any dividends paid to shareholders. In simple terms, Defendants' stock bonuses, and a majority of their annual compensation, was directly tied to the performance of FTAI's stock price—a fact that strongly incentivized Defendants to mischaracterize the nature of the Company, therefore commanding a higher valuation from analysts, and benefitting from the resulting increase in stock price.

185. According to the Summary Compensation table for 2024 in FTAI's 2025 Proxy, Defendant Adams earned $26.7 million in total compensation, of which $18.8 million was from PSUs tied to FTAI's stock price. Similarly, Defendant Nam earned $4.95 million in 2024, of which $2.9 million was from PSUs. Thus, more than 70% of Defendant Adams's reported 2024 compensation, and nearly 60% of Defendant Tam's reported 2024 compensation, was based upon their receipt of PSUs that were linked directly to the Company's share price. This provided them with an exceptionally strong, personal motivation to take whatever actions were necessary – such as inflating Aerospace Products' reported EBITDA – to increase the Company's share price.

186. Defendants Adams and Nam were granted "Outperformance PSUs" during the Class Period in November 2024. FTAI claims in their 2025 Proxy Statement that these PSUs are

---

he did not work exclusively for FTAI. Nonetheless, Defendant Adams was compensated by the former Manager based on the value of services he provided. The former Manager, however, explained to FTAI that it was unable to segregate portions of Defendant Adams's compensation award related solely to services rendered to the Company.

subject to "extremely rigorous performance-based vesting conditions." However, in reality, these "conditions" were easily satisfied in large part due to FTAI's inflation of EBITDA figures. Indeed, if FTAI's Annualized TSR is greater than or equal to 30%, Defendants Adams and Nam would receive the maximum payout at 400% of Target.

187. Defendants' motivation to continue the fraud and keep FTAI's stock price elevated continued throughout and after the Class Period. Indeed, Defendants Adams and Nam had the opportunity to, and did, earn long-term equity incentives, further establishing their desire to inflate the Company's valuation. In March 2025, FTAI granted long-term equity awards to their named executive officers in the form of RSUs and PSUs as "part of [their] annual grant cycle" and based on the Compensation Committee's assessment of performance in 2024.

### B. Under Applicable Accounting Rules, The Segment Information That FTAI Reported For Aerospace Products, Including EBITDA, Was Reviewed And Relied Upon By Defendant Adams

188. On November 23, 2023, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2023-07, addressing Segment Report (Topic 280), entitled Improvements to Reportable Segment Disclosures. As explained by FTAI in its Form 10-Q for Q3 2024, "This ASU modifies the disclosure and presentation requirements of reportable segments. The new guidance requires the disclosure of significant segment expenses that are regularly provided to the chief operating decision maker and included within each reported measure of segment profit and loss." Based on the requirements of Topic 280, FTAI states that:

> Our Chief Executive Officer is our Chief Operating Decision Maker ("CODM"). Segment information is presented in the same manner that our CODM reviews the operating results in assessing performance and allocating resources. The CODM evaluates performance for each reportable segment primarily based on Adjusted EBITDA.

189. Among the types of information that FTAI reports as being reviewed by Defendant Adams (who is the CEO and CODM) are Aerospace Products' revenue, cost of sales, depreciation and amortization, and numerous other categories of revenues and expenses.

190. As explained above, the segment information that is alleged to be false and misleading all was reviewed by Defendant Adams in "assessing performance and allocating resources"; and, Aerospace Products' EBITDA, which is alleged to be misleading to investors, was the disclosed metric primarily relied upon by Defendant Adams in evaluating performance for each reportable segment.

### C. The Aerospace Products Financial Information That Is Alleged To Be False Was Regularly Discussed With Investors By The Individual Defendants

191. As set forth above, Aerospace Products' EBITDA was regularly addressed by both Individual Defendants in conference calls with investors and in FTAI's press releases and filings with the SEC, and has repeatedly been highlighted by Defendants as the key performance indicator upon which investors should rely. Accordingly, both Individual Defendants were knowledgeable regarding EBITDA and how it was determined. Defendant Adams was knowledgeable regarding all of the information reported in FTAI's financial disclosures regarding its Aerospace Products segment since FTAI specifically admits that "[s]egment information is presented in the same manner that our CODM reviews the operating results in assessing performance and allocating resources."

### D. Aerospace Products' EBITDA Was An Essential Component Of FTAI's Financial Reporting And A Primary Driver Of Its Share Price Increases And Thus Was Critical To FTAI's Core Operations

192. The Individual Defendants' knowledge, or reckless disregard, as to the importance of Aerospace Products to FTAI's Adjusted EBITDA, and overall financial success, can be inferred because these facts were critical to FTAI's core operations.

193. The Individual Defendants purposefully touted Aerospace Products as the driver of FTAI's future growth. This narrative became critical to FTAI's scheme to inflate the Aerospace Products' EBITDA and, in turn, the Company's valuation. For instance, prior to the Class Period Defendants repeatedly told investors about the tremendous potential that FTAI's MRE business had to grow the Company's EBITDA. For example, in the Q3 2022 earnings call on October 28, 2022, Defendant Adams emphasized "Aerospace products had another solid quarter with $19 million of EBITDA. We started these activities only a little over a year ago and in the last four quarters have booked approximately $70 million in EBITDA without any contribution from PMA." Defendant Adams went on to state that "[w]e see tremendous potential and feel good about generating $20 million to $30 million in quarterly EBITDA and think $100 million plus in 2023 EBITDA to be very doable." Such statements evidence both that Defendant Adams knew about the importance of the Aerospace Products' EBITDA contributions as well as the details of what those contributions would be currently and into the future.

194. Indeed, on September 6, 2023, FTAI participated in the Deutsche Bank Aircraft Finance & Leasing Conference in which Defendant Adams explained that the "***biggest driver***" of FTAI's EBITDA projections was its MRE business and, in particular, The Module Factory within the Aerospace Products segment, accounting for $400 million of EBITDA out of its $500 million goal for 2026.

195. The market also understood the critical importance of the Aerospace Products segment to FTAI's valuation. For example, on April 25, 2024, Compass Point analysts keyed in on the Aerospace Products segment as "***the most important driver of value*** for FTAI." Similarly, on September 26, 2024, Compass Point increased its price target on FTAI from $119 to $159,

crediting this increase, again, to FTAI's Aerospace Products segment, which was the "***most valuable part of FTAI and the largest source of future upside***."

196. Given the critical importance of FTAI's Aerospace Products division, which represented the driving force behind EBITDA growth and the Company's valuation, Defendants' knowledge or reckless disregard of the inflated EBITDA margins and revenues within the Company's core Aerospace Products business, as well as Defendants' undisclosed scheme and deceptive accounting practices to cover up these issues, can be inferred.

## VIII. LEAD PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

197. At all relevant times, the market for FTAI common stock was open and efficient for the following reasons, among others: (i) FTAI common stock met the requirements for listing on, and was listed and actively traded on, the Nasdaq under the ticker symbol "FTAI"; (ii) as a registered and regulated issuer of securities, FTAI filed periodic public reports with the SEC, in addition to the Company's frequent voluntary dissemination of information; (iii) FTAI regularly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; (iv) FTAI was followed by numerous securities analysts employed by major brokerage firms, including Citi, Deutsche Bank, RBC, Jefferies, Barclays, and Morgan Stanley, who wrote reports that were distributed to the sales force and customers of their respective brokerage firms; (v) the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of FTAI's common stock; and (vi) without knowledge of the misrepresented or omitted facts, Lead Plaintiffs and Class members purchased or otherwise acquired FTAI common stock between the time Defendants made the material misrepresentations and omissions and the time the truth was

revealed, during which period the price of FTAI's common stock was artificially inflated by Defendants' material misrepresentations and omissions.

198. As a result of the foregoing, the market for FTAI common stock promptly digested current information regarding FTAI from all publicly available sources and the price of FTAI's stock reflected such information. Based upon the materially false or misleading statements and omissions of material fact alleged herein, FTAI common stock traded at prices in excess of its true value during the Class Period. Lead Plaintiffs and other Class members purchased or otherwise acquired FTAI common stock relying upon the integrity of the market price of FTAI common stock and other market information relating to FTAI.

199. Under these circumstances, Lead Plaintiffs and other Class members, as purchasers or acquirers of FTAI common stock at artificially inflated prices during the Class Period, suffered similar injuries and a presumption of reliance under the fraud-on-the-market doctrine applies.

200. Further, at all relevant times, Lead Plaintiffs and other Class members relied on Defendants to disclose material information as required by law. Lead Plaintiffs and other Class members would not have purchased or otherwise acquired FTAI common stock at artificially inflated prices if Defendants disclosed all material information as required by law. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts concerning the Company and its business, Lead Plaintiffs and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## IX. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

201. The Private Securities Litigation Reform Act's statutory safe harbor and the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein.

202. None of the statements complained of herein were forward-looking statements. Rather, each was a historical statement or statement of purportedly current facts and conditions at the time each statement was made.

203. To the extent that any materially false or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the statement or portion thereof. As set forth above, given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants do not insulate Defendants from liability for their materially false or misleading statements or omissions.

204. To the extent that the statutory safe harbor applies to any materially false or misleading statement alleged herein, or any portion thereof, Defendants are liable for any such materially false or misleading forward-looking statement because at the time such statement was made the speaker knew the statement was materially false or misleading, or the statement was authorized and approved by an executive officer of FTAI who knew that the forward-looking statement was materially false or misleading.

## X. CLASS ACTION ALLEGATIONS

205. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) individually and on behalf of a Class consisting of all persons and entities that purchased or otherwise acquired the publicly traded common stock of FTAI between July 23, 2024 and January 21, 2025.

206. Excluded from the Class are: (i) Defendants; (ii) present or former executive officers of FTAI, members of FTAI's Board of Directors, and members of their immediate families as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing

persons' legal representatives, heirs, successors, or assigns; (iv) any entity in which Defendants have or had a controlling interest; and (v) any affiliate of FTAI.

207. The Class members are so numerous that joinder of all members is impracticable. Throughout the Class Period, FTAI's securities were actively traded on the Nasdaq. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery from Defendants, Lead Plaintiffs believe that there are at least hundreds, if not thousands, of members in the proposed Class. Class members may be identified from records maintained by FTAI or its transfer agent and may be notified of the pendency of this action by mail using a form of notice customarily used in securities class actions.

208. Lead Plaintiffs' claims are typical of Class members' claims, as all Class members are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws complained of herein.

209. Lead Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class and securities litigation.

210. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are: (i) whether Defendants' acts and omissions as alleged herein violated the federal securities laws; (ii) whether Defendants' statements to the investing public during the Class Period misrepresented or omitted material facts about FTAI's business, operations, and management; (iii) to what extent Class members have sustained damages; and (iv) the proper measure of damages.

211. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. Furthermore,

as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. CAUSES OF ACTION

### COUNT I
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

212. Lead Plaintiffs incorporate by reference and reallege all preceding paragraphs as if fully set forth herein. This claim is brought against Defendants pursuant to Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

213. During the Class Period, Defendants used the means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange to make materially false or misleading statements and omissions of material fact alleged herein to: (i) deceive the investing public, including Lead Plaintiffs; (ii) cause the market price of FTAI common stock to trade above its true value; and (iii) cause Lead Plaintiffs and other Class members to purchase or otherwise acquire FTAI common stock at artificially inflated prices that did not reflect the stock's true value during the Class Period. In furtherance of their unlawful scheme, plan, or course of conduct, Defendants took the actions alleged herein.

214. While in possession of material adverse non-public information, Defendants, individually and in concert, directly or indirectly, by the use of means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange: (i) employed devices, schemes, and artifices to defraud; (ii) made false or misleading statements of material fact and/or failed to disclose material facts or trends required to be disclosed or necessary in order to make the statements made, in light of the circumstances under which they

were made, not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for FTAI common stock, in violation of Section 10(b) and Rule 10b-5. Defendants are alleged as primary participants in the wrongful conduct alleged herein.

215. Defendants acted with knowledge or a reckless disregard for the truth of the materially misrepresented and omitted facts alleged herein in that they failed to disclose such facts, even though such facts were readily available to them, if not known. Defendants' material misrepresentations and omissions were made knowingly and/or recklessly for the purpose and effect of concealing the truth regarding FTAI's operations, business, performance, and prospects from the investing public and supporting the artificially inflated price of its common stock.

216. As set forth above, the dissemination of the materially false or misleading information and failure to disclose material facts artificially inflated or maintained artificial inflation already in the market price of FTAI common stock during the Class Period. Relying directly or indirectly upon the materially false or misleading statements made by Defendants and on the efficiency and integrity of the market in which the Company's common stock trades, and upon the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed by Defendants, Lead Plaintiffs and other Class members purchased or otherwise acquired FTAI common stock during the Class Period at artificially inflated prices. As the previously misrepresented and/or concealed material facts eventually emerged, the price of FTAI common stock substantially declined, causing losses to Lead Plaintiffs and other Class members. These declines and the preceding disclosures are set forth above in Section VI.

217. At the time of the material misrepresentations and omissions alleged herein, Lead Plaintiffs and other Class members were not aware of their falsity and believed them to be true.

Had Lead Plaintiffs and other Class members known the relevant truth regarding FTAI's financial results, operations, business, and prospects, which was misrepresented and/or concealed by Defendants, Lead Plaintiffs and other Class members would not have purchased or otherwise acquired FTAI common stock at artificially inflated prices.

218. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other Class members suffered damages in connection with their transactions in the Company's common stock during the Class Period.

## COUNT II

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder (Against All Defendants)

219. Lead Plaintiffs incorporate by reference and reallege all preceding paragraphs as if fully set forth herein. This Count is asserted on behalf of all members of the Class against Defendant FTAI and the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) promulgated thereunder, 17 C.F.R. § 240.10b-5.

220. Defendant FTAI and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) in that they: (1) employed devices, schemes, and artifices to defraud; and (2) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of FTAI common stock during the Class Period, in an effort to maintain artificially high market prices for FTAI common stock.

221. Defendant FTAI and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the

mails, employed devices, schemes, and artifices to defraud and engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the Class in connection with the purchase and sale of FTAI common stock; which did: (i) deceive the investing public, including Lead Plaintiffs and the Class, regarding, among other things, FTAI's Aerospace Products division's EBITDA, EBITDA growth, EBITDA margins, and revenue, as well as the purported overall growth in Aerospace Products,; (ii) artificially inflate and maintain the market price of FTAI common stock; and (iii) cause Lead Plaintiffs and other members of the Class to purchase FTAI common stock at artificially inflated prices and suffer losses when the true facts became known.

222. As part of their scheme to defraud investors in violation of Rule 10b-5(a) and (c), the Defendants engaged in deceptive accounting practices that inflated the EBITDA of the Aerospace Products division and misled the public about the true nature of FTAI's business.

223. These deceptive acts were part of a course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of FTAI common stock during the Class Period in an effort to maintain artificially high market prices for FTAI common stock.

224. As described above, Defendant FTAI and the Individual Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. Defendant FTAI and the Individual Defendants engaged in this misconduct to conceal FTAI's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

225. Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for FTAI common stock, which artificial inflation was removed from the stock when true facts became known. Lead Plaintiffs and the Class would not have purchased FTAI common stock at the prices they paid, or at all, had they been aware that the market prices for FTAI common stock had been artificially inflated by Defendant FTAI and the Individual Defendants' fraudulent course of conduct.

226. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the fraud alleged herein in connection with their purchases of the Company's common stock during the Class Period.

227. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c), promulgated thereunder.

**COUNT III**
**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

228. Lead Plaintiffs incorporate by reference and reallege all preceding paragraphs as if fully set forth herein. This Count is brought against the Individual Defendants pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Lead Plaintiffs and all other members of the Class.

229. During the Class Period, each of the Individual Defendants was a controlling person of FTAI within the meaning of Section 20(a) of the Exchange Act. By reason of their high-level positions at FTAI and their participation in and/or awareness of the Company's operations and/or intimate knowledge of the materially false or misleading statements and omissions of material fact in statements filed by the Company with the SEC and/or disseminated to the investing public, each of the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company and its executives, including the

content and dissemination of the various statements that Lead Plaintiffs contend were materially false or misleading.

230. Each of the Individual Defendants exercised day-to-day control over the Company and had the power and authority to cause FTAI to engage in the wrongful conduct complained of herein. In this regard, each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be materially misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

231. Each of the Individual Defendants was a direct participant in making, and/or made aware of the circumstances surrounding, the materially false and/or misleading representations and omissions during the Class Period, as alleged here in Section VII. Accordingly, each Individual Defendant was a culpable participant in the underlying violations of Section 10(b) alleged herein.

232. As set forth above, FTAI violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of FTAI and, as a result of their own aforementioned conduct, each of the Individual Defendants is liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as FTAI is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and other members of the Class who purchased or otherwise acquired FTAI's common stock during the Class Period at artificially inflated prices.

233. As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases and/or acquisitions of FTAI's common stock during the Class Period.

## XII. PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs pray for relief and judgment, including:

a. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b. Awarding compensatory damages and equitable relief in favor of Lead Plaintiffs and other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d. Such other and further relief as the Court may deem just and proper.

## XIII. JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury.

DATED: September 18, 2025

Respectfully submitted,

KESSLER TOPAZ MELTZER
& CHECK, LLP

*s/ Sharan Nirmul*
Sharan Nirmul
Geoffrey C. Jarvis
Vanessa M. Milan
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
snirmul@ktmc.com
gjarvis@ktmc.com
vmilan@ktmc.com

LABATON KELLER SUCHAROW LLP
Michael P. Canty
James T. Christie

Grace Harmon
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
mcanty@labaton.com
jchristie@labaton.com
gharmon@labaton.com

*Counsel for Boston Retirement System and City of Hollywood Firefighters' Pension Fund and Lead Counsel for the Class*

KLAUSNER, KAUFMAN, JENSEN
& LEVINSON
Robert D. Klausner
7080 N.W. 4th Street
Plantation, Florida 33317
Telephone: (954) 916-1202
bob@robertdklausner.com

*Additional Counsel for City of Hollywood Firefighters' Pension Fund*